1  Kevin G. Little, SBN 149818
   Michelle L. Tostenrude, SBN 290121
2  **LAW OFFICE OF KEVIN G. LITTLE**
   Post Office Box 8656
3  Fresno, California  93747
   Telephone:  (559) 342-5800
4  Facsimile:   (559) 242-2400
   E-Mail:  kevin@kevinglittle.com
5
6  Attorneys for Plaintiff Lewis Dewane Brown,
   individually and on behalf of all others similarly situated
7
8            **IN THE UNITED STATES DISTRICT COURT**
9        **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**
10

| | |
|---|---|
| 11  LEWIS DEWANE BROWN, individually and on behalf of all others similarly situated, <br><br> 13  Plaintiff, <br><br> 14  v. <br><br> 15  CITY OF FRESNO; CHIEF PACO BALDERRAMA, in his individual capacity; FORMER CHIEF ANDREW HALL, in his individual capacity; MAYOR JERRY DYER, in his individual capacity; LT. ROBERT BECKWITH; SGT. TROY MILLER, in his individual capacity; OFFICER GARY HOLDEN, in his individual capacity; OFFICER ANDREW DIAZ, in his individual capacity; OFFICER NICHOLAS QUISENBERRY, in his individual capacity; UNKNOWN LAW ENFORCEMENT OFFICERS; DOES 1 through 100, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION** <br><br> **COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF** <br><br> • **42 U.S.C. § 1983 - Excessive and Retaliatory Force** <br> • **42 U.S.C. § 1983 - Unconstitutional, Retaliatory Arrest** <br> • **42 U.S.C. § 1983 - Unconstitutional, Retaliatory Prosecution** <br> • **42 U.S.C. § 1983 - Retaliatory Destruction of Property** <br> • **42 U.S.C. § 1983 - Eighth Amendment** <br> • **42 U.S.C. § 1983 - Unconstitutional Destruction of Property** <br> • **42 U.S.C. § 1983 - Supervisory Liability** <br> • **42 U.S.C. § 1983 - Municipal Liability** <br> • **Bane Act - Civil Code § 52.1 - Unconstitutional, Retaliatory Arrest** <br> • **Bane Act - Civil Code § 52.1 - Unconstitutional, Retaliatory Prosecution** <br> • **California State Law - False Arrest** <br> • **California State Law - Malicious Prosecution** <br> • **California State Law - Negligence** <br> • **28 U.S.C. § 2201 - Declaratory and Injunctive Relief** <br> • **Injunctive and Declaratory Relief - Code of Civil Procedure §§ 526, 1060** <br><br> **JURY TRIAL DEMANDED** |

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Lewis Dewane Brown, individually and on behalf of all others similarly situated, makes the following allegations against the defendants, and each of them.

## INTRODUCTION

1.      Homelessness is undoubtedly a nationwide crisis, but it is particularly severe in the Central Valley of California.  Of the 40 American cities with the highest rates of homelessness, six are located in the Central Valley, including the City of Fresno.  Some have reported that Fresno is the site of one of America's most severe homeless crises. Government officials conservatively estimate that the City of Fresno's homeless population is approximately 4,200, but others familiar with the magnitude of Fresno's homeless problem believe that it is at least twice as high.  If one also considers the marginally and sporadically housed, the probable count likely swells to more than 20,000.  Further, given the ongoing pandemic, rising housing costs, and inflation, it is probable that many people presently on the verge of losing shelter will significantly increase the present homeless population in the near future.

2.      No one believes that there is an easy solution to the homelessness crisis, and this lawsuit does not demand one.  While the development of sustainable, long-term housing and connected access to social services should be the long-term goal, there will for the foreseeable future be a sizeable homeless population in the City of Fresno.  The rights of Fresno's homeless population have to be observed and respected while this crisis endures.

3.      Unfortunately, the City of Fresno has a longstanding pattern and practice of mistreating and marginalizing its homeless population, including arbitrarily moving them from place to place, taking and destroying their property without due process, using excessive and unreasonable force on them, punishing those homeless persons who seek to assert their rights, seeking to deprive them of advocacy, and harassing and silencing those who advocate for the homeless.

4.      The City of Fresno's longstanding adversity toward the homeless is exemplified by the facts underlying Mr. Brown's individual causes of action.  On February 21, 2020, Mr. Brown

disagreed with officers who arbitrarily sought to evict him from the campsite that had been his home for nearly a year, which was not even on City property. In response to his protestations, Mr. Brown was beaten up and seriously injured, falsely arrested, wrongfully prosecuted for a year and a half, and had virtually all of his worldly possessions taken and destroyed.

5.     If Mr. Brown's unfortunate saga were unique, this case would only be about him. However, it is not. Mr. Brown therefore brings this action not only on his own behalf, but also on behalf of all others similarly situated.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action, which arises under federal law and federal civil rights law, and also includes supplemental state law claims, pursuant to 28 U.S.C. § 1331, 1343, and 1367.

7.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391 because the actions giving rise to the asserted causes of action occurred within this judicial district, and, Mr. Brown is informed and believes, some or all of the defendants reside within this judicial district as well.

## PARTIES

8.     Plaintiff Lewis Brown is a citizen and resident of the City of Fresno. Mr. Brown is homeless, as he has been for most of the last 20 years. Mr. Brown is 62 years old, and he was 60 years old at the time of the incidents that gave rise to his case. Mr. Brown struggles with addiction to drugs, post-traumatic stress, and unresolved grief. Mr. Brown has a prior criminal record, chiefly consisting of offenses related to his longstanding substance abuse problem.

9.     Defendant City of Fresno is a local municipal body and a political subdivision of the State of California. The City of Fresno is primarily responsible funding and supervising the Fresno Police Department. The City of Fresno is sued based on federal municipal liability principles, as well as California state law and a theory of vicarious responsibility for the acts of the individual defendants sued under state law.

10.     Defendant Chief Paco Balderrama is, upon information and belief, a citizen and resident of the State of California, County of Fresno.  With respect to all of the acts complained of herein, Chief Balderrama was acting as an employee of the Fresno Police Department.  At all material times herein, Chief Balderrama acted individually and within the course and scope of his employment with the Fresno Police Department.  Chief Balderrama is sued in his individual capacity for acts he performed under the color of law.

11.     Defendant Former Chief Andrew Hall is, upon information and belief, a citizen and resident of the State of California, County of Fresno.  With respect to all of the acts complained of herein, Former Chief Hall was acting as an employee of the Fresno Police Department.  At all material times herein, Former Chief Hall acted individually and within the course and scope of his employment with the Fresno Police Department.  Former Chief Hall is sued in his individual capacity for acts he performed under the color of law.

12.     Defendant Mayor Jerry Dyer is, upon information and belief, a citizen and resident of the State of California, County of Fresno.  With respect to all of the acts complained of herein, Mayor Dyer was acting as an official on behalf of the City of Fresno.  At all material times herein, Mayor Dyer acted individually and within the course and scope of his employment with the City of Fresno.  Mayor Dyer is sued in his individual capacity for acts he performed under the color of law.

13.     Defendant Lt. Robert Beckwith is, upon information and belief, a citizen and resident of the State of California, County of Fresno.  With respect to all of the acts complained of herein, Lt. Beckwith was acting as an officer and employee of the Fresno Police Department.  At all material times herein, Lt. Beckwith acted individually and within the course and scope of his employment with the Fresno Police Department.  Lt. Beckwith is sued in his individual capacity for acts he performed under the color of law.

14.     Defendant Sgt. Troy Miller  is, upon information and belief, a citizen and resident of the State of California, County of Fresno.  With respect to all of the acts complained of herein, Sgt. Miller was acting as an officer and employee of the Fresno Police Department.  At all

material times herein, Sgt. Miller acted individually and within the course and scope of his employment with the Fresno Police Department.  Sgt. Miller is sued in his individual capacity for acts he performed under the color of law.

15.    Defendant Officer Gary Holden is, upon information and belief, a citizen and resident of the State of California, County of Fresno.  With respect to all of the acts complained of herein, Officer Holden was acting as an officer and employee of the Fresno Police Department. At all material times herein, Officer Holden acted individually and within the course and scope of his employment with the Fresno Police Department.  Officer Holden is sued in his individual capacity for acts he performed under the color of law.

16.    Defendant Officer Andrew Diaz  is, upon information and belief, a citizen and resident of the State of California, County of Fresno.  With respect to all of the acts complained of herein, Officer Diaz was acting as an officer and employee of the Fresno Police Department.  At all material times herein, Officer Diaz acted individually and within the course and scope of his employment with the Fresno Police Department.  Officer Diaz is sued in his individual capacity for acts he performed under the color of law.

17.    Defendant Officer Nicholas Quisenberry is, upon information and belief, a citizen and resident of the State of California, County of Fresno.  With respect to all of the acts complained of herein, Officer Quisenberry was acting as an officer and employee of the Fresno Police Department.  At all material times herein, Officer Quisenberry acted individually and within the course and scope of his employment with the Fresno Police Department.  Officer Quisenberry is sued in his individual capacity for acts he performed under the color of law.

18.    Mr. Brown is ignorant of the true names and capacities of defendants sued herein as Unknown Law Enforcement Officers, and therefore sues said defendants by such fictitious names. Defendants Unknown Law Enforcement Officers are, upon information and belief, citizens and residents of the State of California, County of Fresno.  With respect to all of the acts complained of herein, Unknown Law Enforcement Officers were acting as officers and employee of the Fresno Police Department or another law enforcement agency.  At all material times herein,

Unknown Law Enforcement Officers acted individually and within the course and scope of their employment with the Fresno Police Department.  Unknown Law Enforcement Officers are sued in their individual capacities for acts they performed under the color of law.

19.     The true names and capacities, whether individual, corporate, public or private, of defendants DOES 1 through 100, inclusive, are currently unknown to Plaintiff, who sue them by fictitious names.  Mr. Brown is informed, believes, and alleges that each fictitiously named DOE defendant was personally involved in the factual transactions alleged herein and is liable based on one or more of the causes of action asserted. Mr. Brown will insert the true names and capacities of these fictitiously named defendants once obtained.

### COMPLIANCE WITH STATE CLAIMS PROCEDURES

20.     Mr. Brown has satisfied the state law requirements set forth in California Government Code § 900 *et seq.* by submitting a timely claim for damages to the City of Fresno within six months of the termination of the continuing unlawful actions of defendants City of Fresno, Sgt. Miller, Officer Holden, Officer Diaz, and Officer Quisenberry.  This action is also timely filed based on the presentation of that claim.  Mr. Brown's claim has been denied by operation of law, at his election, pursuant to California Government Code §§ 913 and  945.6.

### FACTUAL ALLEGATIONS

21.     On February 21, 2020, Mr. Brown was residing at a campsite commonly referred to as the "180 Camp," which borders the north side of State Route 180 near West Avenue, near the ASPCA facility.  On February 21, 2020, Mr. Brown was one of approximately 40 homeless persons who were camping at that site.  Mr. Brown had been living at that site for approximately one year.

22.     The 180 Camp is located on property belonging to the State of California.  In connection with these incidents, no state official requested the assistance of the City of Fresno or requested the ejectment of the campers at the site.

23.     On the morning of February 21, 2020, a team of officers from the Fresno Police Department Homeless Task Force came without notice to the site and began to inform campers

that they had to leave.  These officers included individual defendants Sgt. Miller, Officer Holden, Officer Diaz, and Officer Quisenberry.

24.    Shortly after the Homeless Task Force officers began announcing that the campers had to leave the 180 Camp, Mr. Brown approached one of the officers, believed to be Officer Diaz, and objected to their actions.  Specifically, Mr. Brown asked if a property owner had initiated the process and what was the basis for the officers' authority.  Instead of being treated with respect as a citizen with a legitimate grievance, Mr. Brown was belittled and "cop-splained," although in reality the responding officer had no idea what he was talking about.

25.    Specifically, as alleged above, the 180 Camp is not even on City property, and no prior notice had been given as City policy required at the time.  Moreover, under *Martin v. Boise* and its progeny, it was at the time clearly established  that generalized anti-camping, loitering  and like ordinances violated the Eighth Amendment rights of homeless persons.

26.    In reply to the responding officer's belittlement and misinformation, Mr. Brown responded that he was going to call "Dez," which referred to Dez Martinez of We are Not Invisible (WANI), a grass roots homeless advocacy organization that operates in the City of Fresno and surrounding areas.  In response, the responding officer ominously stated, "Go ahead and call somebody," and told another nearby homeless person to whom Mr. Brown spoke, "Go ahead and listen to this guy [Mr. Brown].  See how that works out."

27.    A very short while later, Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry were walking through the 180 Camp continuing to harass the homeless persons present and telling them they had a clearly unreasonably short amount of time to pack their things and vacate.  When Mr. Brown came into their collective view, one of the officers, who by voice appear to be the same officer that Mr. Brown had spoken with minutes before, falsely stated, "That's the guy who told us we had to leave, that we had no right to be here."  Available video footage confirms that Mr. Brown made no such statements, but even if he had, those comments would qualify as protected speech that would not justify an arrest.

28.     Without being notified that he was being placed under arrest, as required under state law, Mr. Brown was grabbed by one of the defendant officers, believed to be Officer Holden and/or Sgt. Miller.  When Mr. Brown indicated that he was in the process of packing, one of the officers who grabbed him stated, "Well, you're not packing fast enough."  Mr. Brown was arrested for obstructing or delaying a peace officer in violation of Penal Code § 148, a misdemeanor, which had not occurred in the arresting officers' presence as required under state law, and for which they had no probable cause.  It has been clearly established for two generations that a citizen's criticism of law enforcement cannot justify a lawful arrest.  Further, to the extent that Mr. Brown was arrested for trespassing, violating a local anti-camping ordinance, or some similar law, his arrest would have clearly violated *Martin v. Boise*.

29.     Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry then used clearly unreasonable and excessive force on Mr. Brown, then a frail 60-year-old.  Mr. Brown was thrown down to the ground face first, had his legs crossed and raised up behind him toward his waist, had another officer place a knee in his mid-back toward his neck, and had another officer withdraw his firearm.  The firearm was at times pointed directly at Mr. Brown's head. One of the officers, believed to be Sgt. Miller, gratuitously walked over and stepped on Mr. Brown.  The officers had no reason to believe that Mr. Brown was violent or armed, and they had no reason to assume that a man of his apparent age and health could withstand the force used upon him without sustaining serious injury.  This use of force incident was captured on the officers' body-worn cameras.

30.     Mr. Brown sustained injuries to his face, knees, back, and torso, as a result of the defendant officers' uses of force.  Mr. Brown was then hoisted up by his handcuffed arms and taken to another area within the 180 Camp, near police vehicles, even though he still had not been told why he had been arrested.  When Mr. Brown reached the vehicles he was told to sit down. Mr. Brown explained that he had physical limitations, in addition to having just been brutalized. In response, Mr. Brown's legs were unceremoniously kicked out from under him, causing him to fall to the ground.

31.     Mr. Brown was then searched incident to an unlawful arrest, during which time an officer, believed to be Officer Diaz, seized a minuscule amount of methamphetamine from the pocket of Mr. Brown's shorts.  Another very small amount was seized after Mr. Brown had been taken to Community Regional Medical Center to receive medical treatment for his injuries.

32.     Mr. Brown had two tents at the 180 Camp that collectively contained all of his worldly possessions, including his only photo of his predeceased son.  Officers on scene were specifically aware that these tents belonged to Mr. Brown, a fact that was confirmed by more than one other homeless person on scene.  Nonetheless, even though all of Mr. Brown's belongings clearly were not trash or abandoned, they were designated for destruction by the defendant officers, in directives given to the cleanup crew on scene.  These directives were likewise captured on the officers' body-worn camera footage.  The destruction of Mr. Brown's property was in blatant violation of this Court's orders and injunctions issued in *Kincaid v. City of Fresno* more than a decade before, but the City of Fresno and its law enforcement officers have never meaningfully abided by *Kincaid*.  Instead, the City of Fresno and its law enforcement officers have continually disobeyed the Court's orders and injunctions, as set forth more fully herein.

33.     Shortly after his release from custody, Mr. Brown spoke out about his mistreatment, in an article that appeared in the Community Alliance community newspaper on February 24, 2020.  Mr. Brown was assisted in speaking out by Dez Martinez and Mike Rhodes, another longtime homeless advocate in the City of Fresno who wrote the article for the Community Alliance.  The article was highly critical of law enforcement's actions in brutalizing and arresting Mr. Brown.

34.     Only after Mr. Brown spoke out in the media was he charged criminally by the Fresno District Attorney's Office.  Specifically, Mr. Brown was charged with the following offenses on May 14, 2020: (1) Cal. Health and Safety Code § 11377(a) - possession of methamphetamine; (2) Cal. Penal Code § 148(a)(1) - resisting/obstructing a peace officer; (3) Cal. Penal Code § 602(o) - trespassing and refusing to leave private property; and (4) Penal Code § 647e - unlawful lodging.  Mr. Brown was arraigned on these charges on July 13, 2020.

35.      Mr. Brown continued asserting his rights by making a claim for damages in June 2020 and in further requesting the public records pertaining to the February 21, 2020 incident in July 2020.  In response to this complaint and request, Sgt. Miller went to Mr. Brown's sister's house under the guise of investigating his complaint but really in an effort to intimidate him from taking legal action.  Law enforcement also retaliated against Mr. Brown's advocate, the Community Alliance newspaper, and his defense attorney during the course of the events alleged herein, in an apparent attempt to dissuade them from supporting Mr. Brown and the cause of Fresno's homeless in general.

36.      The reports written by the individual officer defendants were full of misstatements and outright lies.  The reports misstated that the 180 Camp was located on property owned by the City of Fresno.  The reports also falsely stated that Mr. Brown was given ample time to leave the area.  The reports further falsely stated that Mr. Brown "verbally resisted" and attempted to rally other homeless persons to resist law enforcement.  The reports also falsely implied that Mr. Brown was informed that he was being arrested for trespassing, and that he resisted law enforcement.  The reports also falsely claim that multiple homeless people confronted the officers and refused to leave the area, and said the officers would have to arrest them.  The reports further falsely state that officers had told homeless persons, including Mr. Brown, at the 180 Camp a month prior that they had to leave.  The reports also falsely stated that Mr. Brown was non-compliant and refused to sit down.  The reports further falsely indicated that there had been an anonymous report complaining about the 180 Camp.  The reports also falsely implied that Fresno has sufficient shelter space for its homeless, which could not be farther from the truth according to the City's own point-in-time reports.  The reports additionally falsely state that Mr. Brown was warned he would be arrested when he first spoke with an officer on February 21, 2020, and that he accused that same officer of lying, said  to that same officer that he was not going anywhere and that the officer was the one trespassing.  The reports also falsely state that Officer Quisenberry reholstered his weapon much earlier than he actually did.  The reports also falsely state that other homeless persons were running toward the arresting officers during their interaction with Mr.

Brown. The reports also misstate that Mr. Brown injured his face himself by rubbing it on the ground. In sum, there is very little about the reports written by the defendant officers that was complete, truthful and accurate, which is how officers are trained to document incidents. The false information in the reports led directly to the filing of criminal charges against Mr. Brown.

37. After obtaining the discovery he requested and beginning in September 2020, Mr. Brown insisted on a speedy trial, withdrawing his time waiver under Cal. Penal Code § 1382. Nonetheless, Mr. Brown was required to come back to court again and again for a trial that continued to be delayed. It was not until June 2021 that Mr. Brown finally had his day in court. Shortly before trial, the charges under Cal. Penal Code §§ 602(o) and 647e were dismissed, and the Cal. Health and Safety § 11377 charge was dismissed at the conclusion of the prosecution's case due to insufficient evidence. On June 29, 2021, the jury found Mr. Brown not guilty of resisting or obstructing a peace officer. Clearly, Mr. Brown's criminal case resulted in a resolution that was entirely favorable to him.

38. As stated above in paragraphs 3 and 4, what happened to Mr. Brown is reflective of the City of Fresno's longstanding and continuing hostility toward the homeless community, which includes:

(A) From the beginning of the homeless crisis in Fresno, and continuing with impunity through at least 2006, the Fresno Police Department and other city agencies engaged in the systematic harassment of the City of Fresno's homeless population, including by over-enforcing the law against them, making capricious and unnecessary arrests essentially because of the homeless statuses of persons, and issuing citations for actions that are inherent in homelessness itself (such as loitering, trespassing, going to the restroom in public, not having animals registered, littering, and the existence of other conditions that could not readily be avoided). These actions resulted in many homeless persons being subject to the mass incarceration system for petty offenses, or having warrants issued against them due to their being unable to appear in court or pay the fines imposed as a result of citations. These harassing activities had the effect of making the very existence of many homeless persons illegal and

making them subject to arrest wherever they were found.  Furthermore, during these law enforcement activities, law enforcement typically would verbally abuse the homeless, including but not limited to the making of ridiculing, disparaging, and condescending commentary.

(B)    During this same time period, the City of Fresno would engage in arbitrary and punitive "cleanup sweep" activities that also were intended to harass the homeless.  These "cleanups" resulted in the belongings of the homeless persons being treated as trash.  The belongings of the homeless, including shelters, tents, clothing, pets, bedding, medicines, appliances, food, utensils, priceless items of sentimental value, being taken away – typically on very short notice or with no notice at all.  These cleanup sweeps would often be initiated when the weather was particularly oppressive.  During these cleanup sweeps, items of value in the possession of homeless persons would be taken and converted for personal use by City employees without any consequences from onlooking colleagues or supervisors.  The officers and City officials involved in these cleanup sweeps also routinely verbally abused the homeless persons they encountered in the same manner described above.

(C)    In October 2006, Pamela Kincaid, Doug Deathrage, Charlene Clay, Cynthia Greene, Joanna Garcia, Randy Johnson, Sandra Thomas, Alphonso Williams and Jeanine Nelson, individually and on behalf of others similarly situated, filed an action against the City of Fresno and many of its employees, No. 1:06-cv-1445 OWW SMS.  The class action lawsuit was certified to include all persons who were homeless in Fresno on or after October 17, 2003 whose personal belongings had been unlawfully taken and destroyed during a cleanup sweep.  This class action lawsuit resulted in a 2008 judgment incorporating the terms of a settlement agreement.

(D)    In 2008, the City of Fresno announced a 10-year plan to end homelessness, a plan that was devised primarily with input from developers and local business organizations.  This initiative began a now longstanding pattern of "poverty pimping" by the City of Fresno, i.e., the pursuit of initiatives ostensibly intended to improve the lives of Fresno's homeless but which in reality have accomplished little for the stated beneficiaries and instead have resulted in the transfer of large amounts of public funds to other city agencies, or private commercial interests.

Indeed, it is estimated that the City of Fresno has received and/or allocated approximately half a billion dollars to homeless initiatives in the last 20 years, without achieving any significant impact on the homelessness crisis. Instead, most of those funds have gone to law enforcement, other City of Fresno agencies or budget items, or to private developers or companies. The various City of Fresno initiatives have had many different labels, from BeFresno and HousingFirst in the 2000s to the current Beautify Fresno and Operation Off-Ramp in existence today, but the net effect has remained the same: there has been no material change in the lives of the great majority of the City of Fresno's homeless, or in the adversarial stance the City of Fresno has taken toward its homeless population.

(E)     In approximately 2012, the Fresno-Madera Continuum of Care (FMCoC) was formed, a multi-entity agency dominated by government and law enforcement officials antagonistic to the homeless, including from the City of Fresno, and also by local business interests. FMCoC performs the annual Point in Time (PiT) count, which many believe has resulted in drastic undercounts of the number of homeless in the Fresno-Madera area for political purposes. FMCoC has also done little or nothing to advocate for the homeless. FMCoC has taken a passive role despite the recognition of a board member in a 2012 interview that the local strategy for dealing with the homeless crisis is primarily to "push them from one place to another."

(F)     Continuing after the filing of the *Kincaid* lawsuit and even after its settlement, the City of Fresno continued its same harassment of the homeless, both in terms of its harassing law enforcement and cleanup sweep activities. The only significant difference was that the City of Fresno Police Department began to assign a team of officers particularly to patrol homeless encampments. This team of officers eventually became known as the Homeless Task Force (HTF). While ostensibly having the mission of ensuring the health and welfare of City of Fresno's homeless population, the HTF continued the same harassment practices that previously were customary. Homeless people remained the subject of harassing and capricious over-enforcement of the law and short notice cleanup sweeps that resulted in their displacement and the destruction of their belongings, typically with little or no advance notice. The verbal abuse also

continued. The reign of terror of the HTF continued from approximately 2008 until 2021, and during that time the above-described misconduct routinely occurred. By the time the HTF was disbanded, even its previously staunchest supporters conceded that it was an abject failure.

(G) After the *Kincaid* litigation was terminated, the City of Fresno continued its blatant bulldozing of homeless encampments, once again under the guise of "cleanup sweeps." For example, in October and November of 2011, the City of Fresno bulldozed a number of homeless encampments in downtown Fresno, which resulted in the destruction of property and displacement of scores of homeless persons. In the aftermath of that misconduct, 36 homeless persons filed federal lawsuits objecting to and seeking damages as a result of their property being bulldozed. The 2011 encampment bulldozings were captured in part on video and occurred in the presence of not only law enforcement and cleanup personnel, but also attorneys from a law firm retained by the City – who apparently were utilized during the cleanup sweep in an effort to legitimize the blatant misconduct that occurred. In litigation, the City of Fresno based its defense on a stated position that everything bulldozed was trash, but that assessment was made without any notice or opportunity for the owners to make their own determination. The City of Fresno has frequently utilized the designation of bulldozed property as "trash" in the aftermath of the *Kincaid* litigation in order to avoid the process that was established under the injunction issued during that case, i.e., that items identified as property be held for up to 90 days so that they could be reclaimed. The City of Fresno settled those 36 lawsuits in 2014, but, as alleged herein below, continued its same destructive practices.

(H) Local law enforcement leadership has continuously and intentionally distorted and over-publicized crime in homeless encampments as justification for bulldozing encampments and displacing homeless communities. For example, in 2013 then Fresno Police Chief Dyer released a statement claiming that homeless camps were being used as refuges by significant numbers of fugitive gang members, without any supporting proof that active gang members were strategically utilizing homeless encampments to avoid arrest for serious crimes.

(I)     In 2013, despite two  lawsuits and a valid injunction, the City of Fresno further increased its pattern of capricious arrests, citations, code enforcement and other law enforcement harassment of its homeless population.  This increased harassment included a policy of seizing and/or disposing of the property of homeless persons and engaging in an active campaign to displace homeless persons from campsites.  Part of the City of Fresno's augmented enforcement included increasing the size and budget of the HTF.

(J)     In 2015 and at various other times since then, the City of Fresno has proposed establishing a tent city for the homeless in a remote area of town, removed from services and the rest of the community, and heavily supervised by law enforcement.  This setting would only serve to marginalize the homeless community further, and subject them to law enforcement harassment away from the public scrutiny.  Mayor Dyer has in the past been a proponent of these proposals.

(K)     In the last ten years, the City of Fresno has pressured owners of private lots to evict the homeless, or themselves face stiff penalties for their altruism.  Indeed, more recently, the City of Fresno has enacted an ordinance that has the effect of penalizing property owners who allow the homeless to camp on unused private lots, since city officials can now enter these lots without permission and arbitrarily engage in "cleanup" activities billed to the owners.  This ordinance also has empowered local law enforcement to engage in arbitrary cleanup sweeps even on private property.

(L)     Even though the Ninth Circuit ruled as early as 2006 that involuntary conduct related to homelessness could not be punished consistent with the Eighth Amendment, *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), *vacated on other grounds*, 505 F.3d 1006 99th Cir. 2007), the City of Fresno has enforced and enacted a number of policies, initiatives and ordinances intended to do exactly that.  These measures remained in place in the City of Fresno even after the issuance of *Martin v. City of Boise* decisions by the Ninth Circuit in 2018 and 2019.  *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018), *amended* 920 F.3d 584 (9th Cir. 2019), *cert. denied*, 140 S.Ct. 674 (2019), which confirmed that *Jones* remained the law of this

Circuit.  Indeed, as of the date of Mr. Brown's arrest on February 21, 2021, HTF officers had not even been trained regarding the impact of those decisions.  Officers Holden, Diaz and Quisenberry testified to this lack of training in Mr. Brown's criminal trial. Instead of abiding by *Kincaid* and *Martin*, and even since the 2014 settlement post-*Kincaid*, Fresno HTF officers in the last ten years have continued to frequently and aggressively perform cleanup sweeps.  In connection with those cleanup sweeps, HTF officers and other city personnel have continued to seize and destroy the property of the homeless, rarely complying with the notice and claim procedures established by *Kincaid*.  The theft of the valuables of homeless persons also continued during this same time period, as did the mistreatment and verbal abuse.

(M)    Despite the contrary trend in the law, and despite the undeniable lack of available shelter space in the City of Fresno to house its large homeless population, the City of Fresno has systematically enforced and enacted a number of policies, initiatives and ordinances intended to harass the homeless in the last ten years.  Among these homeless adversarial measures are: (1) the passing of an anti-camping ordinance in 2017 intended to criminalize homelessness; (2) a prohibition against 10 or more homeless people camping together for more than 10 days at a time; and (3) the establishment of no panhandling zones, i.e., the posting of signs discouraging donations to the homeless.

(N)    The HTF, other Fresno law enforcement, and other city officials have continued to engage in the aggressive harassment of the homeless, even after *Martin* became final at the end of 2019 and even during the COVID-19 pandemic. *Martin* prohibits the enforcement of laws criminalizing homelessness on public land, i.e., generalized anti-camping, trespassing, illegal lodging and similar laws, unless a jurisdiction has sufficient shelter space for its homeless.  Even under the severely undercounted PiT numbers, Fresno has a woefully insufficient amount of shelter space, as documented by the yearly FMCoC reports.  Nonetheless, the City of Fresno continues to eject the homeless from public lands, utilizing unannounced cleanup sweeps as a pretextual means of ejecting the homeless and destroying their property.  It would of course be much cheaper for the City of Fresno to provide trash bins, dumpsters and sanitary facilities where

the homeless camp, but it instead performs short notice or no-notice cleanup sweeps that are intended to displace the homeless despite *Martin*. The City of Fresno also threatened and harassed individual homeless persons as a means of making them leave spaces where they were allowed to be under *Martin*, even when there were no cleanup sweeps taking place. The City of Fresno law enforcement  also relied on the false narrative that homeless persons were "refusing help" even when no shelter space was available, as another means of getting around *Martin*'s prohibitions. Fresno law enforcement also continues harassing and bullying the homeless, as can be seen on some of the 180 Camp body-worn camera footage.

(O)     In late 2020, the Fresno County Grand Jury issued a report criticizing the FMCoC's failure to utilize available funding and hire staff, the lack of coordination in providing homeless services, the mishandling of potential conflicts of interests among Board members, the lack of  audits regarding homeless grant funds, and the insufficient notice regarding awards of grant funds.

(P)     The City of Fresno continued its pattern of law enforcement harassment, frequent surprise cleaning sweeps, wanton property destruction, and the intentional displacement of the homeless from campsites during the COVID-19 pandemic. This pattern of misconduct continued even despite the legal prohibitions of *Kincaid* and *Martin*, and further despite the continued shortage of even temporary shelter space and the dearth of longer term housing alternatives. The City of Fresno also made no effort to track or mitigate the spread of COVID-19 among the homeless population, despite their greater susceptibility. To the contrary, the recurrent displacement of the homeless placed them at an even greater risk of transmission.

(Q)     In City of Fresno City Council meetings held in April and July 2021, council members were shockingly candid about their desire to continue breaking up homeless camps and doing surprise cleanup sweeps, again despite *Kincaid* and *Martin* and further despite the continuing shortage of even temporary shelter.

(R)     In 2021 and 2022 the City of Fresno has done a number of surprise evictions of homeless camps near freeways, as part of its Beautify Fresno and Operation Off-

Ramp initiatives. These evictions, like in decades past, were typically done with little or no advance notice, effectively preventing many homeless persons from preserving their property, again despite contrary legal requirements, the lack of available shelter space, and during an ongoing pandemic.

(S)    In 2021 the disbanded HTF was replaced by the Fresno Police Department's Homeless Assistance Response Team (HART), with a stated mission of providing a more humanitarian and compassionate response to the plight of the homeless. Unfortunately, little has changed. HART has continued to perform surprise evictions and cleanup sweeps, including evictions/cleanups in downtown Fresno in August 2021, December 2021, and January 2022. Oddly, the August 2021 action, effectuated during a record heatwave, was preceded by a email to Mike Rhodes, a homeless advocate and Community Alliance reporter, with a warning that it was not to be disseminated. The December 2021 action was performed in the midst of a rainstorm. The January 2022 action was done without any advance notice and without any available shelter space for most of those displaced.

(T)    The City of Fresno has also actively attempted to undermine, marginalize and retaliate against those who advocate for the homeless against the above-described pattern of misconduct. The moving force behind WANI is Dez Martinez, who herself used to be homeless in Fresno. WANI often has served as an advocate and intermediary between homeless persons and law enforcement, since many homeless persons are unable to communicate effectively for themselves and are unaware of their rights. Ms. Martinez is also a vocal opponent of the City of Fresno's policies and practices toward the homeless, and she documents a significant amount of this misconduct on video's posted to WANI's Facebook page. WANI also sponsored a campsite, called the Safe Camp, on state property in downtown Fresno for nearly two years. The City of Fresno has engaged in a pattern of harassment of Ms. Martinez. Ms. Martinez has been falsely arrested by the Fresno Police Department, physically attacked by other City of Fresno employees, and disparaged by certain City of Fresno Council members in public meetings, and had her Safe Camp shut down. Mayor Dyer has personally retaliated against Ms. Martinez and WANI, after

she exposed government misconduct related to homelessness last year, and he even recently barged into a meeting between Ms. Martinez and City Councilman Miguel Arias and angrily ordered him not to communicate with her.  The City of Fresno also recently passed an ordinance that makes it a misdemeanor for anyone to enter the site of a City of Fresno "abatement action" without express permission from City officials.  This ordinance is a thinly veiled pretext for an effort to prevent Ms. Martinez and other homeless advocates not afraid to criticize the City from assisting the homeless.  If someone in the future attempts to contact a homeless advocate during ongoing City misconduct, as Mr. Brown did on February 21, 2020, the City will have discretion to prevent the advocate from providing assistance or documenting the misconduct.

(U)    By contrast, the City of Fresno rewards and empowers organizations such as the Fresno Rescue Mission and the Poverello House, which have long been coopted by the City of Fresno  and therefore lack the capacity to advocate for the homeless in the face of misconduct by city officials.  Instead, these organizations, while they do good, charitable work, unquestioningly support any and every City of Fresno initiative adverse to the homeless.

(V)    While the City of Fresno has lauded itself recently for the renovation and repurposing of old motels as shelter space, it is in reality just a continuation of the longstanding pattern of poverty pimping that has occurred for the last two decades.  These shelters are only temporary living spaces and they are still woefully inadequate to house even a quarter of Fresno's homeless on any given night.  These shelters also do not provide the residents with any of the essential services they need to make a meaningful change in their lives.  The greatest beneficiary of the state and federal funds the City has received for this motel renovation has been the developers with whom the City of Fresno has contracted.  The City of Fresno has prioritized temporary shelter space over sustainable, long term living arrangements so that it can continue its abusive enforcement and cleanup actions, which continue even today.  Moreover, these motels are resemblant of a correctional setting, since they have been staffed with abusive, corrupt, untrained security personnel, who have the effective ability to harass, abuse, deny shelter to, or even evict any homeless resident they might arbitrarily target.  The City also has not been transparent about

how the funds related to the motel renovations are being spent. Indeed, even the Fresno City Council has expressed frustration about being left in the financial dark by the City administration. Moreover, the long term plan seems to be to transition these motels to private housing, for which the homeless will pay the eventual developer/owners with their meager benefits or labor, in exchange for living in a correctional-like environment devoid of services.

39.     The above-chronicled longstanding pattern of antipathy toward the homeless by the City of Fresno was the moving force behind the violation of Mr. Brown's First, Fourth, Eighth and Fourteenth Amendment Rights, and of the violation of the Eighth and Fourteenth Amendment rights of the many other homeless persons victimized by the City's pattern of illegal cleanup sweeps in violation of *Kincaid* and *Martin* since February 21, 2020. The City of Fresno failure to train, encourage, instruct, or supervise the individual defendants not to retaliate against homeless persons, not to arrest or punish them based on their homeless statuses, or not to destroy their property during cleanup sweeps. The individual defendant officers were not trained or encouraged to abide by the holdings of *Kincaid* or *Martin*. To the contrary, through its repeated initiatives adverse to the homeless, the City and its leadership, including policymakers Chief Balderrama, Former Chief Hall, and Mayor Dyer, have established customs, policies, and practices encouraging misconduct against the homeless. Moreover, the City of Fresno's historic antipathy toward its homeless community reflects a pattern of deliberate indifference to their constitutional rights, and this indifference was directly related to the constitutional violations of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, and of the other Unknown Law Enforcement Officers who violated the Eighth and Fourteenth Amendment rights of other homeless persons since February 21, 2020.

40.     The supervisory defendants, Chief Balderrama, former Chief Hall, Mayor and former Chief Dyer, and Lt. Beckwith all failed to act in a manner to prevent the denial of the constitutional rights of Mr. Brown and/or others similarly situated, i.e., those who were victimized during illegal cleanup sweeps and had their Eight Amendment rights not to be punished based on their homeless statuses, or to have their personal property destroyed or seized without notice or

meaningful recourse.  Chief Balderrama has been the lead supervisor and policymaking official of the Fresno Police Department since January 2021, and he had every opportunity to make sure that the February 21, 2020 incident pertaining to Mr. Brown became a teaching moment for his officers, yet he failed to make any changes in the historic pattern of illegal cleanup sweeps, or to make sure his officers complied with *Kincaid* and *Martin*.  Former Chief Hall was the lead supervisor and policymaking official at the time of the February 21, 2020 incident and thereafter, and he failed to make sure the HTF officers were aware of and abided by *Kincaid* and *Martin* at all times during the remainder of his tenure as Chief of Police.   Mayor Dyer has displayed a longstanding antipathy toward the rights of the homeless, which has continued since he became Mayor in January 2021.  Mayor Dyer had every opportunity to make sure that the February 21, 2020 incident pertaining to Mr. Brown became a teaching moment for Fresno law enforcement and city employees, yet he failed to make any changes in the historic pattern of illegal cleanup sweeps, or to make ensure compliance with *Kincaid* and *Martin*.  Lt. Beckwith was the HTF Commander at the time of the February 21, 2020 incident and thereafter, and he failed to make sure the HTF officers were aware of and abided by *Kincaid* and *Martin* at all times during the remainder of his tenure supervising the HTF.

41.     Instead, all of these supervisory officials were aware of the legal requirements of *Kincaid* and *Martin* in 2020 and/or 2021 and failed to act to supervise their subordinates in a manner to promote obedience to those legal requirements.  Indeed, these supervisors knew or should have reasonably known that the officers of the Fresno Police Department and other City employees were routinely violating the Eighth and Fourteenth Amendment rights of the homeless, and, at minimum, failed to act to prevent said abuses.  To the contrary, the foregoing allegations suggest that these supervisors actually encouraged officers under their supervision to violate the Eighth and Fourteenth Amendment rights of the homeless during the last two years, and that this encouragement caused the violation of those rights not only in Mr. Brown's case but in the many other instances where the homeless were punished for their statuses or had their property deprived since February 21, 2020.  The actions or failures to act of these supervisory defendants were so

closely related with the deprivations of the rights of the homeless as to constitute the moving force behind those violations.

42.    The misconduct complained of herein was intentionally committed, and it will continue to reoccur unless the City of Fresno and the individual defendants are restrained by the Court.

## CLASS ALLEGATIONS

43.    Certain of the claims set forth herein are brought by plaintiff Mr. Brown on behalf of all others similarly situated, pursuant to Federal Rule of Civil Procedure 23.  Mr. Brown proposes the applicable class of persons be defined as follows:

> *All homeless persons in the City of Fresno since February 21, 2020 who have had or will have laws or initiatives enforced against them based on their homeless status, or who have had or will have their belongings seized and destroyed in a manner that is contrary to Kincaid and/or in violation of their personal property rights.*

44.    The members of this proposed class well exceed 100 persons based on Mr. Brown's information and belief, such that individual joinder of all affected persons would be impracticable or impossible.

45.    There exist common questions of law and/or fact that predominate over any questions affecting only individual members of the proposed class.  Among the common questions are the following:

(A)    Whether the City of Fresno has subjected homeless persons residing on generalized public lands to punishment at times when the City's total available shelter space was less than its homeless population, based on laws or initiatives of general application, in violation of *Martin*.  Included among these laws or initiatives are prohibitions of public camping, trespass on public land, loitering, vagrancy, generalized health and safety laws or ordinances, other similar criminal or regulatory prohibitions.

(B)    Whether the City of Fresno has deprived homeless persons of their property rights by performing short or no notice cleanup sweeps.

(C)    Whether the City of Fresno has contravened *Kincaid* by performing short or no notice cleanup sweeps in areas where homeless people resided.

(D)    Whether the allegations of paragraph 38 can be substantiated in a manner so as to demonstrate a pattern of hostility or antipathy by the City of Fresno against its homeless community.

(E)    Whether one or more of the supervisor defendants, i.e., Chief Balderrama, Former Chief Hall, Mayor Dyer, or Lt. Beckwith violated 42 U.S.C. § 1983 by permitting and/or encouraging the enforcement of laws against homeless persons residing on public lands in a manner that demonstrated deliberate indifference to the rights of the homeless under *Martin*.

(F)    Whether one or more of the supervisor defendants, i.e., Chief Balderrama, Former Chief Hall, Mayor Dyer, or Lt. Beckwith violated 42 U.S.C. § 1983 by permitting and/or encouraging the deprivation of the property rights of homeless persons in a manner that demonstrated deliberate indifference to the constitutional rights of the homeless.

(G)    Whether one or more of the supervisor defendants, i.e., Chief Balderrama, Former Chief Hall, Mayor Dyer, or Lt. Beckwith violated 42 U.S.C. § 1983 by permitting and/or encouraging the performance of cleanup sweeps in areas where homeless persons resided in a manner that demonstrated deliberate indifference to the constitutional rights of the homeless under *Kincaid* and its progeny.

(H)    Whether class-wide injunctive relief should be ordered, and, if so, the nature and scope of such relief.

46.    Mr. Brown is not compromised or impaired in his ability to represent the proposed class as a whole, and he can fairly and adequately represent the interests of the class.  Mr. Brown has retained counsel experienced in complex civil rights litigation.  Mr. Brown also has no individual interests that would conflict with the proposed class.

47.     A class action is superior to any other method of adjudicating this case and controversy.  The primary class relief sought is injunctive, and the burden and expense of presenting the claims of individual proposed class members would make it impractical for them each to seek redress separately.  Individual litigation by each member of the proposed class would also substantially burden the operation of the judicial system.  Finally, the nature and amount of damages of the majority of the proposed class members are similar and may be established by common proof.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

42 U.S.C. § 1983 - Excessive and Retaliatory Force

(By Mr. Brown Individually Against Defendants Sgt. Miller, Officer Holden,

Officer Diaz and Officer Quisenberry)

48.     Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

49.     The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, as described above, constitute a deprivation of Mr. Brown's rights, privileges, and immunities protected under the United States Constitution, specifically his rights protected under the First and Fourth Amendment to be free from retaliatory, unreasonable, and excessive force. Due to the facts as stated above demonstrating that no use of force was warranted against Mr. Brown and that the use of excessive force closely followed his objection to and criticism of official action, the force used on Mr. Brown implicates not only his First Amendment but also his Fourth Amendment rights.  A reasonable person would be chilled in their exercise of their First Amendment right to freedom of speech based upon the defendant officers' violent, injurious reactions to Mr. Brown's protected speech.

50.     As a direct and proximate result of the defendant officers' above-mentioned misconduct, Mr. Brown suffered substantial damages as alleged herein above.

51.     The defendant officers' misconduct as set forth above was intentional, wanton,

malicious, oppressive and undertaken with reckless disregard for Mr. Brown's rights, thus entitling him to punitive damages.

SECOND CAUSE OF ACTION

42 U.S.C. § 1983 - Unconstitutional and Retaliatory Arrest

(By Mr. Brown Individually Against Defendants Sgt. Miller, Officer Holden,

Officer Diaz and Officer Quisenberry)

52.     Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

53.     The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, as described above, constitute a deprivation of Mr. Brown's rights, privileges, and immunities protected under the United States Constitution, specifically his rights protected under the First and Fourth Amendment to be free from retaliatory and false arrests unsupported by probable cause. Because the above recited facts demonstrate that there was no probable cause to arrest Mr. Brown, and said arrest also followed from Mr. Brown's assertion of his right to monitor, question, and criticize government authority, his arrest implicates his rights under both the First and Fourth Amendments. A reasonable person in Mr. Brown's position would have been chilled in the exercise of his free speech based upon the defendant officers' retaliatory arrest, which also lacked probable cause.

54.     As a direct and proximate result of the defendant officers' abovementioned misconduct, Mr. Brown suffered substantial damages as alleged herein above.

55.     The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's rights, thus entitling him to punitive damages.

///

///

///

THIRD CAUSE OF ACTION

42 U.S.C. § 1983 - Unconstitutional and Retaliatory Prosecution

(By Mr. Brown Individually Against Defendants Sgt. Miller, Officer Holden,

Officer Diaz and Officer Quisenberry)

56.     Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

57.     The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, as described above, resulted in Mr. Brown's unconstitutional and retaliatory criminal prosecution.  Specifically, the defendant officers authored reports that were false and misleading in all of the respects identified in paragraph 36, above. As a result of these false and misleading reports, which were a continuation of the defendant officers' pattern of retaliation, Mr. Brown was criminally charged by the Fresno District Attorney.  An accurate rendition of the facts would have revealed that there was no basis for Mr. Brown's arrest or prosecution, which was filed lacking probable cause and in retaliation for his protected activity. A reasonable person in Mr. Brown's position would have been chilled in the exercise of his free speech based upon the defendant officers' retaliatory initiation of criminal proceedings, which also lacked probable cause.  The initiation of the criminal prosecution against Mr. Brown therefore violated his First and Fourth Amendment rights, and a reasonable person in his position would have been chilled in the exercise of his free speech based upon the defendant officers' retaliatory acts.

58.     At all relevant times, the defendant officers knew that Mr. Brown was acting within his protected rights at the time that he was unlawfully arrested on February 21, 2020, and also when they recommended the initiation of criminal charges against him.

59.     The criminal case (Fresno Sup. Ct. Case No. M20916161) against Mr. Brown was resolved in his favor when he was found to be not guilty of California Penal Code § 148(a)(1) on June 29, 2021, prior to which time all other charges had been dismissed.

60.     As a direct and proximate result of the defendant officers' abovementioned misconduct, Mr. Brown suffered substantial damages as alleged herein above.

61.     The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's rights, thus entitling him to punitive damages.

FOURTH CAUSE OF ACTION

42 U.S.C. § 1983 - Retaliatory Destruction of Property

(By Mr. Brown Individually Against Defendants Sgt. Miller, Officer Holden,

Officer Diaz and Officer Quisenberry)

62.     Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

63.     The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, as described above, constitute a deprivation of Mr. Brown's rights, privileges, and immunities protected under the United States Constitution, specifically his substantive due process rights protected under the First and Fourteenth Amendment to be free from retaliatory destruction of his personal property. The individual defendant officers, exhibiting a retaliatory animus based on Mr. Brown's protected activity and with deliberate indifference to his property rights, ordered the destruction of all his worldly belongings on February 21, 2020. A reasonable person in Mr. Brown's position would have been chilled in the exercise of his free speech based upon the defendant officers' retaliatory destruction of his property.

64.     As a direct and proximate result of the defendant officers' abovementioned misconduct, Mr. Brown suffered substantial damages as alleged herein above.

65.     The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's rights, thus entitling him to punitive damages.

FIFTH CAUSE OF ACTION

42 U.S.C. § 1983 - Eighth Amendment

(By Mr. Brown Individually and On Behalf of All Others Similarly

Situated Against Defendants Sgt. Miller, Officer Holden,

Officer Diaz and Officer Quisenberry and Unknown Law Enforcement Officers)

66.     Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

67.     The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz, Officer Quisenberry, and Unknown Law Enforcement Officers, as described above, constitute a deprivation of the plaintiffs' rights, privileges, and immunities protected under the United States Constitution, specifically the Eighth Amendment rights of Mr. Brown and the proposed class members not to be subjected – as homeless persons residing on generalized public lands – to punishment at times when the City's total available shelter space was less than its homeless population, based on laws or initiatives of general application, in violation of *Martin*. Included among these laws or initiatives invalidated by *Martin* are prohibitions of public camping, trespass on public land, loitering, vagrancy, generalized health and safety laws or ordinances, other similar criminal or regulatory prohibitions.

68.     As a direct and proximate result of the defendant officers' abovementioned misconduct, Mr. Brown and the proposed class members suffered substantial damages as alleged herein above.

69.     The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's and the proposed class members' rights, thus entitling them to punitive damages.

///

///

///

SIXTH CAUSE OF ACTION

42 U.S.C. § 1983 - Unconstitutional Destruction of Property

(By Mr. Brown Individually and On Behalf of All Others Similarly

Situated Against Defendants Sgt. Miller, Officer Holden,

Officer Diaz and Officer Quisenberry and Unknown Law Enforcement Officers)

70.      Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

71.      The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, and Unknown Law Enforcement Officers, as described above, constitute a deprivation of Mr. Brown's and the proposed class members' rights, privileges, and immunities protected under the United States Constitution, specifically their substantive due process rights protected under the Fourteenth Amendment to be free from the unwarranted destruction of their personal property. The individual defendant officers acted with deliberate indifference to the property rights of Mr. Brown and the proposed class members, by ordering the destruction of their belongings on and after February 21, 2020.

72.      As a direct and proximate result of the defendant officers' abovementioned misconduct, Mr. Brown and the proposed class members have suffered substantial damages as alleged herein above.

73.      The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's and the proposed class members rights, thus entitling them to punitive damages.

///

///

///

SEVENTH CAUSE OF ACTION

42 U.S.C. § 1983 - Supervisory Liability

(By Mr. Brown Individually and On Behalf of All Others Similarly

Situated Against Defendants Chief Balderrama, Former Chief Hall,

Mayor Dyer, and Lt. Beckwith)

74.    Mr. Brown re-alleges and incorporates by reference each of the preceding

paragraphs as though fully set forth herein.

75.    As alleged herein above, the supervisor defendants, Chief Balderrama, Former

Chief Hall, Mayor Dyer, and Lt. Beckwith all failed to act in a manner to prevent the denial of the

constitutional rights of Mr. Brown and the proposed class members, i.e., those who were

victimized during illegal cleanup sweeps and had their Eighth Amendment rights not to be

punished based on their homeless statuses, or to have their personal property destroyed or seized

without notice or meaningful recourse.  Chief Balderrama has been the lead supervisor and

policymaking official of the Fresno Police Department since January 2021, and he had every

opportunity to make sure that the February 21, 2020 incident pertaining to Mr. Brown became a

teaching moment for his officers, yet he failed to make any changes in the historic pattern of

illegal cleanup sweeps, or to make sure his officers complied with *Kincaid* and *Martin*.  Former

Chief Hall was the lead supervisor and policymaking official at the time of the February 21, 2020

incident and thereafter, and he failed to make sure the HTF officers were aware of and abided by

*Kincaid* and *Martin* at all times during the remainder of his tenure as Chief of Police.   Mayor

Dyer has displayed a longstanding antipathy toward the rights of the homeless, which has

continued since he became Mayor in January 2021.  Mayor Dyer had every opportunity to make

sure that the February 21, 2020 incident pertaining to Mr. Brown became a teaching moment for

Fresno law enforcement and city employees, yet he failed to make any changes in the historic

pattern of illegal cleanup sweeps, or to make ensure compliance with *Kincaid* and *Martin*.  Lt.

Beckwith was the HTF Commander at the time of the February 21, 2020 incident and thereafter,

and he failed to make sure the HTF officers were aware of and abided by *Kincaid* and *Martin* at all times during the remainder of his tenure supervising the HTF.

76.    Instead, all of these supervisory officials were aware of the legal requirements of *Kincaid* and *Martin* in 2020 and/or 2021 and failed to act to supervise their subordinates in a manner to promote obedience to those legal requirements. Indeed, these supervisors knew or should have reasonably known that the officers of the Fresno Police Department and other City employees were routinely violating the Eighth and Fourteenth Amendment rights of the homeless, and, at minimum, failed to act to prevent said abuses. To the contrary, the foregoing allegations suggest that these supervisors actually encouraged officers under their supervision to violate the Eighth and Fourteenth Amendment rights of the homeless in the last two years, and that this encouragement caused the violation of those rights not only in Mr. Brown's case, but also in the many other instances where the homeless were punished for their statuses or had their property right deprived since February 21, 2020. The actions or failures to act of these supervisory defendants were so closely related with the deprivations of the rights of the homeless as to constitute the moving force behind those violations.

77.    As a direct and proximate result of the defendant officers' abovementioned misconduct, Mr. Brown and the proposed class members suffered substantial damages as alleged herein above.

78.    The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for the rights and other similarly situated, thus entitling them to punitive damages.

EIGHTH CAUSE OF ACTION

42 U.S.C. § 1983 - Municipal Liability

(By Mr. Brown Individually and On Behalf of All Others Similarly

Situated Against the City of Fresno)

79.    Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

80.    Mr. Brown is informed, believes, and thereon alleges that the City of Fresno's policies, practices, and/or customs were a moving force behind the constitutional violations alleged herein above, which are common to him and the proposed class members.  Specifically, the City of Fresno and the policymakers of the Fresno Police Department have failed to train, encourage, instruct, or supervise the individual defendants not to enforce laws and initiatives against the homeless based on their statuses, or not to destroy the property of homeless persons during cleanup sweeps.  This custom, policy and/or practice is reflective of the City of Fresno's longstanding antipathy to the plight of the homeless, as alleged above, and was the moving force behind the individual defendants' violations of the plaintiffs' rights under the Eighth and Fourteenth Amendments.

81.    As a direct and proximate result of the City of Fresno's offending customs, policies and/or practices, it is liable to  Mr. Brown and the proposed class members for the above-alleged violations of their Eighth and Fourteenth Amendment rights.

NINTH CAUSE OF ACTION

Bane Act - California Civil Code § 52.1 - Unlawful and Retaliatory Arrest

(By Mr. Brown Individually Against Defendants Sgt. Miller, Officer Holden,

Officer Diaz, Officer Quisenberry and the City of Fresno)

82.    Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

83.    The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, as described above, constitute a deprivation of Mr. Brown's rights, privileges, and immunities protected under the United States and California Constitution, specifically his rights protected under the First and Fourth Amendment and under article 1 of the California Constitutions, §§ 2 and 13 to be free from retaliatory and false arrests. Due to the facts as stated above demonstrating that there was no probable cause to arrest Mr. Brown and that his arrest closely followed his objection to and criticism of official action, the arrest of Mr. Brown implicates both his free speech rights and also his rights against unlawful seizures of his person.

A reasonable person would be chilled in their exercise of their free speech rights based upon the defendant officers' violent, unlawful reactions to Mr. Brown's protected speech.  Moreover, as prohibited by California Civil Code § 52.1, this violation was accomplish by means of threats, intimidation, and/or coercion.

84.     As a direct and proximate result of the defendant officers' above-mentioned misconduct, Mr. Brown suffered substantial damages as alleged herein above.

85.     Because the defendant officers were acting under color of state law when they deprived Mr. Brown of his state and federal constitutional rights, defendant City of Fresno is vicariously liable for the Mr. Brown's damages.

86.     The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's rights, thus entitling him to punitive damages.

TENTH CAUSE OF ACTION

California Civil Code § 52.1 - Malicious and Retaliatory Prosecution

(By Mr. Brown Individually Against Defendants Sgt. Miller, Officer Holden,

Officer Diaz, Officer Quisenberry and the City of Fresno)

87.     Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

88.     The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, as described above, resulted in Mr. Brown's unconstitutional and retaliatory criminal prosecution.  Specifically, the defendant officers authored reports that were false and misleading in all of the respects identified in paragraph 36, above. As a result of these false and misleading reports, which were a continuation of the defendant officers' pattern of retaliation, Mr. Brown was criminally charged by the Fresno District Attorney.  An accurate rendition of the facts would have revealed that there was no basis for Mr. Brown's arrest or prosecution, which was filed lacking probable cause and in retaliation for his protected activity. A reasonable person in Mr. Brown's position would have been chilled in the exercise of his free

speech based upon the defendant officers' retaliatory initiation of criminal proceedings, which also lacked probable cause. The initiation of the criminal prosecution against Mr. Brown therefore violated his under the United States and California Constitutions, specifically his rights protected under the First and Fourth Amendment and under article 1 of the California Constitutions, §§ 2 and 13 to be free from retaliatory and malicious prosecutions. Additionally, a reasonable person in Mr. Brown's position would have been chilled in the exercise of his free speech based upon the defendant officers' retaliatory acts. Moreover, as prohibited by California Civil Code § 52.1, this violation was accomplish by means of threats, intimidation, and/or coercion.

89. At all relevant times, the defendant officers knew that Mr. Brown was acting within his protected rights at the time that he was unlawfully arrested on February 21, 2020, and also when they recommended the initiation of criminal charges against him.

90. The criminal case (Fresno Sup. Ct. Case No. M20916161) against Mr. Brown was resolved in his favor when he was found to be not guilty of California Penal Code § 148(a)(1) on June 29, 2021, prior to which time all other charges had been dismissed.

91. As a direct and proximate result of the defendant officers' above-mentioned misconduct, Mr. Brown suffered substantial damages as alleged herein above.

92. Because the defendant officers were acting under color of state law when they deprived Mr. Brown of his state and federal constitutional rights, defendant City of Fresno is vicariously liable for the Mr. Brown's damages.

93. The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's rights, thus entitling him to punitive damages.

ELEVENTH CAUSE OF ACTION

California State Law - False Arrest

(By Mr. Brown Individually Against Defendants Sgt. Miller, Officer Holden, Officer Diaz, Officer Quisenberry and the City of Fresno)

94.     Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

95.     The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, as described above, violated Mr. Brown's right under state law to be free from false arrests. The facts as stated above demonstrate that there was no probable cause to arrest Mr. Brown and that his arrest closely followed his objection to and criticism of official action.

96.     As a direct and proximate result of the defendant officers' above-mentioned misconduct, Mr. Brown suffered substantial damages as alleged herein above.

97.     Because the defendant officers were acting under color of state law when they deprived Mr. Brown of his state and federal constitutional rights, defendant City of Fresno is vicariously liable for the Mr. Brown's damages.

98.     The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's rights, thus entitling him to punitive damages.

## TWELFTH CAUSE OF ACTION

California State Law - Malicious Prosecution

(By Mr. Brown Individually Against Defendants Sgt. Miller, Officer Holden, Officer Diaz, Officer Quisenberry and the City of Fresno)

99.     Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

100.    The intentional and reckless actions of defendants Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry, as described above, resulted in Mr. Brown's malicious prosecution, without probable cause.  Specifically, the defendant officers authored reports that were false and misleading in all of the respects identified in paragraph 36, above. As a result of these false and misleading reports, which were a continuation of the defendant officers' pattern of retaliation, Mr. Brown was criminal charged by the Fresno District Attorney.  An accurate

rendition of the facts would have revealed that there was no basis for Mr. Brown's arrest or prosecution, which was filed lacking probable cause and in retaliation for his protected activity.

101.    At all relevant times, the defendant officers knew that Mr. Brown was acting within his protected rights at the time that he was unlawfully arrested on February 21, 2020, and also when they recommended the initiation of criminal charges against him.

102.    The criminal case (Fresno Sup. Ct. Case No. M20916161) against Mr. Brown was resolved in his favor when he was found to be not guilty of California Penal Code § 148(a)(1) on June 29, 2021, prior to which time all other charges had been dismissed.

103.    As a direct and proximate result of the defendant officers' above-mentioned misconduct, Mr. Brown suffered substantial damages as alleged herein above.

104.    Because the defendant officers were acting under color of state law when they deprived Mr. Brown of his state and federal constitutional rights, defendant City of Fresno is vicariously liable for the Mr. Brown's damages.

105.    The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's rights, thus entitling him to punitive damages.

106.    The defendant officers' misconduct as set forth above was intentional, wanton, malicious, oppressive and undertaken with reckless disregard for Mr. Brown's rights, thus entitling him to punitive damages.

THIRTEENTH CAUSE OF ACTION

California State Law - Negligence

(By Mr. Brown Individually Against Defendants Sgt. Miller, Officer Holden,

Officer Diaz, Officer Quisenberry and the City of Fresno)

107.    Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

108.    As a result of the defendant officers' actions in arresting, initiating the prosecution of, and destroying the property of Mr. Brown, he was subject to negligent misconduct and is

entitled to seek compensation under California law. Specifically, the officers had a duty, under California law not to cause harm to him, and also to engage in the non-negligent performance of their duties. The defendant officers breached those duties as to Mr. Brown on February 21, 2020 and caused him harm.

109.    As a direct and proximate result of the defendant officers' above-mentioned misconduct, Mr. Brown suffered substantial damages.

110.    Because the defendant officers were acting under color of state law when they acted negligently, the City of Fresno is vicariously liable for Mr. Brown's damages.

FOURTEENTH CAUSE OF ACTION

28 U.S.C. § 2201- Declaratory and Injunctive Relief

(By Mr. Brown Individually and On Behalf of All Others Similarly

Situated Against the City of Fresno)

111.    Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

112.    The foregoing factual allegations set forth an actual controversy with respect to whether Mr. Brown's and the proposed class members' Eighth and Fourteenth Amendment rights were violated and are being violated. Therefore, this proceeding is an appropriate one for declaratory and injunctive relief under 28 U.S.C. § 2201.

113.    Declaratory and injunctive relief under federal law is warranted based on the City of Fresno's policies, practices, and/or customs that were the moving force behind the constitutional violations alleged herein above, which are common to Mr. Brown and the proposed class members.  Specifically, the City of Fresno and the policymakers of the Fresno Police Department have failed to train, encourage, instruct, or supervise the individual defendants not to enforce laws and initiatives against them based on their homeless statuses, or not to destroy the property of homeless persons during cleanup sweeps.  This custom, policy and/or practice is reflective of the City of Fresno's longstanding antipathy to the plight of the homeless, as alleged

above, and was the moving force behind the individual defendants' violations of Mr. Brown's and the proposed class members' rights under the Eighth and Fourteenth Amendments.

114.    Because of the irreparable harm that the foregoing allegations show have occurred and likely will reoccur in the future, Mr. Brown and the proposed class members request declaratory and injunctive relief requiring the City of Fresno to cease and desist from enforcing laws of general application against homeless persons residing on public property in violation of *Martin*, and the Eighth Amendment, and also to cease and desist from the unlawful seizure and destruction of their personal property, in violation of *Kincaid* and the Fourteenth Amendment.

115.    Mr. Brown and the proposed class members also request further necessary and proper relief as provided for under 28 U.S.C. § 2202, as may be determined by the Court.

FIFTEENTH CAUSE OF ACTION

Injunctive and Declaratory Relief - Code of Civil Procedure § 526, 1060

(By Mr. Brown Individually and On Behalf of All Others Similarly

Situated Against the City of Fresno)

116.    Mr. Brown re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

117.    The foregoing factual allegations set forth an actual controversy with respect to whether Mr. Brown's and the proposed class members' Eighth and Fourteenth Amendment rights were violated and are being violated. Therefore, this proceeding is an appropriate one for declaratory and injunctive relief under 28 U.S.C. § 2201.

118.    Declaratory and injunctive relief under federal law is warranted based on the City of Fresno's policies, practices, and/or customs that were the moving force behind the constitutional violations alleged herein above, which are common to Mr. Brown and the proposed class members.  Specifically, the City of Fresno and the policymakers of the Fresno Police Department have failed to train, encourage, instruct, or supervise the individual defendants not to enforce laws and initiatives against the homeless based on their statuses, or not to destroy the property of homeless persons during cleanup sweeps.  This custom, policy and/or practice is

reflective of the City of Fresno's longstanding antipathy to the plight of the homeless, as alleged above, and was the moving force behind the individual defendants' violations of Mr. Brown's and the proposed class members' rights under the federal and state constitutions, and also under state law as alleged herein above.

119.    Because of the irreparable harm that the foregoing allegations show have occurred and likely will reoccur in the future, Mr. Brown and the proposed class members request declaratory and injunctive relief requiring the City of Fresno to cease and desist from enforcing laws of general application against homeless persons residing on public property in violation of *Martin*, the Eighth Amendment, and applicable state law, and also to cease and desist from the unlawful seizure and destruction of their personal property, in violation of *Kincaid* and the Fourteenth Amendment, and applicable state law.

120.    Mr. Brown and the proposed class members also request further necessary and proper relief as provided for under Code of Civil Procedure §§ 526 and 1060, as may be determined by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Brown and the proposed class members pray for relief as follows:

1.    For general and special damages against each defendant in an amount proven at trial, as to all causes of action seeking legal relief;

2.    For punitive damages against the individual defendants in an amount appropriate to punish and deter others from engaging in similar conduct, as to all causes of action seeking legal relief other than the Thirteenth Cause of Action;

3.    For statutory penalties pursuant to Cal. Civil Code 52.1(b) as to the Bane Act causes of action;

4.    For prejudgment interest as to all causes of action seeking legal relief;

5.    For and award of attorney's fees and costs as to all eligible causes of action, pursuant to 42 U.S.C. § 1988, Cal. Civil Code 52.1(I), and/or Cal. Code of Civil Procedure § 1021.5;

6.      For temporary, preliminary, and permanent injunctive relief to prevent the continued reoccurrence of the denial of the rights of the homeless, which prohibit their being punished for residing on public property, based on their homeless statuses, and also prohibit the seizure and destruction of their property;

7.      For other such relief as the Court may deem proper.

DEMAND FOR TRIAL BY JURY

Mr. Brown and the proposed class members hereby demand a trial by jury.

Date: February 21, 2022                    LAW OFFICE OF KEVIN G. LITTLE

                                           */s/ Kevin G. Little*
                                           Kevin G. Little
                                           Attorneys for Plaintiff Lewis Dewane Brown.