**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LEWIS DEWANE BROWN,<br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>CITY OF FRESNO, et al.,<br><br>　　　　　　　Defendants. | Case No. 1:22-cv-00216-JLT-SAB<br><br>ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND MOTION TO STRIKE WITH LEAVE TO AMEND<br><br>(Docs. 16, 31) |

Plaintiff Lewis Dewane Brown is a resident of Fresno, California. He brings this action against the City of Fresno ("City"), Mayor Jerry Dyer, Chief of the Fresno Police Department ("FPD") Paco Balderrama, its Former Chief Andrew Hall, Lt. Robert Beck, Sgt. Troy Miller, Officer Gary Holden, Officer Andrew Diaz, and Officer Nicholas Quisenberry, alleging various violations of federal and state laws in connection with their treatment of homeless people and, in particular, the arrest of Mr. Brown. (Doc. 1.) For the reasons set forth below, the Court **GRANTS IN PART** Defendant's motions to dismiss and motion to strike.

## I.　INTRODUCTION

### A.　Background

The instant action arises from how the City of Fresno and its police officers have interacted with homeless people in Fresno. "Fresno is the site of one of America's most severe homeless crises." (Doc. 1 at ¶ 1.) "Government officials conservatively estimate that the City of Fresno's homeless population is approximately 4,200," others "believe that it is at least twice as high." (*Id.*)

1

Plaintiff alleges that the City of Fresno has been engaging in systematic harassment of the City of Fresno's homeless population by, other things, "making capricious and unnecessary arrests essentially because of the homeless statuses of persons, [] issuing citations for actions that are inherent in homelessness itself," "engag[ing] in arbitrary and punitive 'cleanup sweep' activities" that "resulted in the belongings of the homeless persons being treated as trash." (*Id*. at ¶ 38(A), (B).) "For example, in October and November of 2011, the City of Fresno bulldozed a number of homeless encampments in downtown Fresno, which resulted in the destruction of property and displacement of scores of homeless persons." (*Id*. at ¶ 38(G).) Plaintiff also alleges that "the City of Fresno has systematically enforced and enacted a number of policies, initiatives and ordinances intended to harass the homeless in the last ten years. Among these homeless adversarial measures are: (1) the passing of an anti-camping ordinance in 2017 intended to criminalize homelessness; (2) a prohibition against 10 or more homeless people camping together for more than 10 days at a time; and (3) the establishment of no panhandling zones, i.e., the posting of signs discouraging donations to the homeless." (*Id*. at ¶ 38(M).)

According to Plaintiff, officers from the City's Homeless Task Force (HTF) have, over the past 10 years, "continued to frequently and aggressively perform cleanup sweeps. In connection with those cleanup sweeps, HTF officers and other city personnel have continued to seize and destroy the property of the homeless, rarely complying with the notice and claim procedures established by [this Court's decision in] *Kincaid*." (*Id*. at ¶ 38(L).) More recently, "[i]n 2021 and 2022 the City of Fresno has done a number of surprise evictions of homeless camps near freeways," and "were typically done with little or no advance notice,"[1] which, according to Plaintiff, "effectively preventing many homeless persons from preserving their property[.]" (*Id*. at ¶ 38(R).) In one instance, the City allegedly sent an "email to Mike Rhodes, a homeless advocate and Community Alliance reporter, with a warning that" he was not to disseminate news of a planned eviction/cleanup. (*Id*. at ¶ 38(S).)

"Mr. Brown was residing at a campsite commonly referred to as the '180 Camp,' which

---

[1] Plaintiff also alleges that members of the City Council have been "shockingly candid about their desire to continue breaking up homeless camps and doing surprise cleanup sweeps, [] despite *Kincaid* and *Martin*," during City Council meetings held in April and July 2021. (*Id*. at ¶ 38(Q).)

borders the north side of State Route 180 near West Avenue, near the ASPCA facility." (*Id*. at ¶ 21.) He had been living there for about one year. (*Id*.) On the morning of February 21, 2020, a team of officers from the Fresno Police Department Homeless Task Force ("HTF"), including individual defendants Sgt. Miller, Officer Holden, Officer Diaz, and Officer Quisenberry, "came without notice to the site and began to inform campers that they had to leave." (*Id*. at ¶ 23.) "Mr. Brown approached one of the officers, believed to be Officer Diaz, and objected to their actions. Specifically, Mr. Brown asked if a property owner had initiated the process and what was the basis for the officers' authority." (*Id*. at ¶ 24.) Mr. Brown stated that "he was going to call" "Dez Martinez of We are Not Invisible (WANI), a grass roots homeless advocacy organization that operates in the City of Fresno and surrounding areas. In response, the responding officer . . . stated, 'Go ahead and call somebody,' and told another nearby homeless person to whom Mr. Brown spoke, 'Go ahead and listen to this guy [Mr. Brown]. See how that works out.'" (*Id*. at ¶ 26 (alteration in original).)

Meanwhile, "Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry were walking through the 180 Camp" telling people they had to pack their things and vacate. (*Id*. at ¶ 27.) "When Mr. Brown came into their collective view, one of the officers, who by voice appear to be the same officer that Mr. Brown had spoken with minutes before, . . . stated, 'That's the guy who told us we had to leave, that we had no right to be here." (*Id*.)

"Without being notified that he was being placed under arrest, . . . Mr. Brown was grabbed by one of the defendant officers, believed to be Officer Holden and/or Sgt. Miller. When Mr. Brown indicated that he was in the process of packing, one of the officers who grabbed him stated, 'Well, you're not packing fast enough.'" (*Id*. at ¶ 28.)

Mr. Brown alleges that Sgt. Miller, Officer Holden, Officer Diaz and Officer Quisenberry "used clearly unreasonable and excessive force" on him, "a frail 60-year-old." (*Id*. at ¶ 29.) In particular, he alleges that he "was thrown down to the ground face first, had his legs crossed and raised up behind him toward his waist, had another officer place a knee in his mid-back toward his neck, and had another officer withdraw his firearm." (*Id*.) Mr. Brown further alleges that "[t]he officers had no reason to believe that Mr. Brown was violent or armed, and they had no

reason to assume that a man of his apparent age and health could withstand the force used upon him without sustaining serious injury." (*Id*.)

"Mr. Brown sustained injuries to his face, knees, back, and torso, as a result of the defendant officers' uses of force. Mr. Brown was then hoisted up by his handcuffed arms and taken to another area within the 180 Camp, . . . [and] was told to sit down." (*Id*. at ¶ 30.) "Mr. Brown explained that he had physical limitations[.] . . . In response, Mr. Brown's legs were . . . kicked out from under him, causing him to fall to the ground." (*Id*.) Mr. Brown was then searched incident to arrest, during which time an officer seized a small amount of methamphetamine from his pocket. (*Id*. at ¶ 31.)

Officers on scene were allegedly aware that two tents belonged to Mr. Brown. (*Id*. at ¶ 32.) Mr. Brown alleges that, "even though all of [his] belongings clearly were not trash or abandoned, they were designated for destruction by the defendant officers, in directives given to the cleanup crew on scene." (*Id*.)

Mr. Brown "spoke out" about his mistreatment in a newspaper article on February 24, 2020, which "was highly critical of law enforcement's actions in brutalizing and arresting Mr. Brown." (*Id*. at ¶ 33.) Then, he was charged with the following offenses on May 14, 2020: "(1) Cal. Health and Safety Code § 11377(a) - possession of methamphetamine; (2) Cal. Penal Code § 148(a)(1) - resisting/obstructing a peace officer; (3) Cal. Penal Code § 602(o) - trespassing and refusing to leave private property; and (4) Penal Code § 647e - unlawful lodging." (*Id*. at ¶ 34.)

Mr. Brown alleges that, in response to his complaint and his request for public records pertaining to the February 21, 2020 incident, "Sgt. Miller went to Mr. Brown's sister's house under the guise of investigating his complaint but really in an effort to intimidate him from taking legal action." (*Id*. at ¶ 35.) Plaintiff also alleges that the City of Fresno has "actively attempted to undermine, marginalize and retaliate against those who advocate for the homeless against the [its] pattern of misconduct." (*Id*. at ¶ 38(T).)

Mr. Brown also asserts that reports on the February 21, 2020 incident, which were "written by the individual officer defendants," included many "misstatements and outright lies." (*Id*. at ¶ 36.) According to Mr. Brown, "[t]he false information in the reports led directly to the

filing of criminal charges against [him]." (*Id*. at ¶ 36.) The charges under Cal. Penal Code §§ 602(o) and 647e were dismissed prior to a state court trial, and the Cal. Health and Safety § 11377 charge was dismissed at the conclusion of the prosecution's case due to insufficient evidence. (*Id*. at ¶ 37.) A jury found Mr. Brown not guilty of the sole remaining charge—resisting or obstructing a peace officer. (*Id*.)

### B. Procedural History

Plaintiff filed this instant action on February 1, 2022 against the City of Fresno, Chief Paco Balderrama, Former Chief Andrew Hall, Mayor Jerry Dyer, Lt. Robert Beck, Sgt. Troy Miller, Officer Gary Holden, Officer Andrew Diaz, and Officer Nicholas Quisenberry. (Doc. 1.) The Complaint alleges the following causes of action: (1) excessive and retaliatory force in violation of the First and Fourth Amendments; (2) retaliatory and false arrest in violation of the First and Fourth Amendments; (3) retaliatory prosecution in violation of the First Amendment; (4) retaliatory destruction of property in violation of the First Amendment; (5) criminal punishment for camping on public property in violation of the Eighth Amendment; (6) destruction of property without procedural due process; (7) supervisory liability under § 1983; (8) municipal liability under § 1983; (9) retaliatory arrest under state civil rights law; (10) malicious and retaliatory prosecution under state civil rights law; (11) false arrest under state common law; (12) malicious prosecution under state common law; (13) negligence under state common law; (14) seeking declaratory and injunctive relief for violations of federal law pursuant to 28 U.S.C. § 2201; and (15) seeking injunctive and declaratory under state law.

The City now moves to dismiss the eighth cause of action and to strike parts of the Complaint. (Doc. 16.) Balderrama, Beckwith, Diaz, Dyer, Hall, Holden, and Quisenberry ("Individual Defendants")[2] separately moved to dismiss the first, second, third, fifth, seventh, ninth, tenth, eleventh, twelfth, and thirteenth causes of action for failure to state a claim upon which relief can be granted. (Doc. 31.)

### II.    LEGAL STANDARD

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move

---

[2] Defendant Miller filed an answer with jury demand. (Doc. 22.)

to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

This plausibility inquiry is a "context-specific task that requires [this Court] to draw on its judicial experience and common sense," *id*. at 679, and "'draw all reasonable inferences in favor of the nonmoving party[,]'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)). "Conclusory allegations and unreasonable inferences," however, "do not provide [] a basis" for determining whether a plaintiff has plausibly stated a claim for relief. *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (citation omitted).

### III.    THE EFFECT OF *GRANTS PASS*

In *City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 551–60 (2024), the Supreme Court held that generally applicable laws that criminalize camping on public property do not violate the Eighth Amendment by criminalizing a person's status as being homeless, thereby overruling the Ninth Circuit's opinion in *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019). After *Grants Pass* was decided, this Court directed the parties to each file a supplemental brief addressing the extent to which *Grants Pass* affects the claims in the instant action. (Doc. 51.)

Plaintiff acknowledges that *Grants Pass* implicates the fifth, seventh, eighth, fourteenth, and fifteenth causes of action, but "only to the extent [he] request[s] prospective relief based on *Martin*." (Doc. 52 at 3.) As such, Plaintiff contends that he "should be allowed to proceed with his individual and retrospective causes of action despite the later *Grants Pass* decision[.]" (*Id*.)

The City and Individual Defendants argue that they "cannot be held liable for violating a non-existent constitutional right, even if the [c]ourts mistakenly thought [said] right existed at the time." (Doc. 54 at 2, 4.) They contend that those causes of action should be dismissed entirely, without regard to any distinction between prospective and retrospective reliefs. (*Id*. at 4.)

The Supreme Court's decision in *Harper v. Virginia Department of Taxation* stands for the proposition that federal courts must give retroactive effect to constitutional decisions of the

Supreme Court. 509 U.S. 86, 94 (1993) ("'[B]oth the common law and our own decisions' have 'recognized a general rule of retrospective effect for the constitutional decisions of this Court.'" (quoting *Robinson v. Neil*, 409 U.S. 505, 507 (1973))). Specifically, when the Supreme "Court decides a case and applies the (new) legal rule of that case to the parties before it, . . . it and other courts must [apply] that same (new) legal rule [] 'retroactive[ly]' . . . to all pending cases, *whether or not those cases involve predecision events*." *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995) (emphasis added). Plaintiff identifies no language in *Grants Pass* suggesting a departure from this rule. Absent explicit guidance to the contrary, the Supreme Court's "[s]ilence on the issue [of retroactivity] indicates that the decision [should] be given retroactive effect." *Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1099 (9th Cir. 2016) (citations omitted).

The Ninth Circuit's § 1983 jurisprudence provides this Court with another reason to apply *Grants Pass* to retrospective claims for damages. A plaintiff may recover damages under § 1983 only when a federal right has been violated and the right was clearly established at the time of the violation. *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019). The Ninth Circuit has explained that the question of whether "a constitutional violation occurred" should be decided by the current case law, whereas the question of whether an officer acted reasonably in light of "clearly established" law for purposes of qualified immunity should be evaluated in accordance with the relevant case law that existed at the time of the purported constitutional violation. *Id.* at 600–02; *see also Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) ("To evaluate whether there is a constitutional violation, we apply the current law." (citing *Sandoval v. County of San Diego*, 985 F.3d 657, 678 (9th Cir. 2021))). The Court therefore applies the current case law—i.e., *Grants Pass*—when considering whether Plaintiff has suffered a constitutional injury, not *Martin*, which has been expressly overruled by the Supreme Court.

For these reasons, the Court rejects Plaintiff's argument that he should be allowed to proceed with his retrospective causes of action. Accordingly, the Court **DISMISSES** Plaintiff's fifth cause of action **WITH PREJUDICE**, as it is entirely reliant on *Martin* and its progeny. The Court also **DISMISSES** Plaintiff's seventh, eighth, fourteenth, and fifteenth causes of action

7

**WITH PREJUDICE** to the extent that they rely on a legal theory foreclosed by *Grants Pass*.

## IV.   REMAINING FEDERAL CLAIMS

### A.  Second Cause of Action: Retaliatory Arrest

Plaintiff alleges under the second cause of action that officers on the scene arrested him in retaliation of his speech, unsupported by probable cause. (Doc. 1 at ¶ 53.) A "plaintiff[] bringing 'First Amendment retaliatory arrest claims' must generally 'plead and prove the absence of probable cause,' because the presence of probable cause generally 'speaks to the objective reasonableness of an arrest' and suggests that the 'officer's animus' is not what caused the arrest." *Ballentine*, 28 F.4th at 61–62 (quoting *Nieves v. Bartlett*, 587 U.S. 391, 401–02 (2019)). In addition to showing the absence of probable cause or the applicability of the *Nieves* exception, *id.* at 63, the latter of which is not at issue here, a plaintiff must show that an officer's retaliatory animus "was a substantial or motivating factor behind [his arrest]," *Nieves*, 587 U.S. at 404 (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 97 (2018)) (alteration modified).

Officers Holden, Diaz, and Quisenberry ("Officers") argue in their motion to dismiss that they had probable cause to arrest Plaintiff, as evidenced by the state court charges against Plaintiff. (Doc. 31 at 16–17; *see also* Doc. 1 at ¶ 28.)[3] Officers, however, have not cited the relevant legal standard, nor have they analyzed the elements of collateral estoppel. *See Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019) (discussing the relevant California state law which governs the application of collateral estoppel in a federal civil rights action in California). Consequently, Officers have not carried their "burden of raising [collateral estoppel, an affirmative defense,] . . . and showing that its application is clear on the face of the [C]omplaint." *See Patrick v. City of Chicago*, 81 F.4th 730, 736 (7th Cir. 2023) (citing *McDonald v. Adamson*, 840 F.3d 343, 347 (7th Cir. 2016)); *see also Durnford v. MusclePharm Corp.*, 907 F.3d 595, 604 n.8 (9th Cir. 2018) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." (citations and quotation marks omitted)).

---

[3] The Complaint points out, (Doc. 1 at ¶ 37), that Plaintiff has obtained a favorable termination of his state court criminal case for purposes of § 1983, *see Thompson v. Clark*, 596 U.S. 36, 39 (2022).

The Court recognizes that a criminal trial cannot occur without a determination that probable cause exists for that prosecution. However, to apply issue preclusion in the context of a motion to dismiss, the defense must show that the evidence presented at the preliminary hearing was not materially different from the allegations made in the Complaint. (*Wige v. City of Los Angeles*, 713 F.3d 1183, 1185 (9th Cir. 2013). The Court does not have this information. Even had the defense made this showing, Plaintiff alleges that the criminal proceedings were tainted by a long list of alleged misstatements and lies from Officers. (*See* Doc. 1 at ¶¶ 36–37). This also prevents the Court from evaluating whether the criminal court's determination of probable cause defeats the claim brought by the plaintiff. *Wige* at 1186; *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004) ("Among the ways that a plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." (citations omitted)).

On the other hand, "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested," and it is an assessment that is based on the totality of circumstances. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Officers first argue that paragraph 28 of the "Complaint confirms that Plaintiff was not complying with [their] orders of packing his belongings and vacating the premises[]" in violation of California Penal Code § 148(a)(1), (Doc. 37 at 6 (citing Doc. 1 at ¶ 28); *see also* Doc. 1 at ¶ 34), which makes it a misdemeanor to "willfully resist[], delay[], or obstruct[] any public officer," Cal. Pen. Code § 148(a)(1). Paragraph 28, however, only shows that Plaintiff was allegedly not "packing fast enough," (Doc. 1 at ¶ 28); and paragraph 27 alleges that he "had a clearly unreasonably short amount of time to pack," (*Id.* at ¶ 27.) Viewing these allegations in the light most favorable to Plaintiff, the Complaint adequately alleges that Plaintiff was not "willfully" resisting the Officers' orders and that their conduct was motivated by retaliation.

Officers also contend that paragraphs 24 and 31 of the Complaint "confirm" that they

"had probable cause to arrest Plaintiff [] for willfully resisting, delaying, and obstructing the Officers[.] . . ." (Doc. 31 at 17 (citing Doc. 1 at ¶¶ 24, 31).) However, Plaintiff's *verbal* objections to Officers' actions, (Doc. 1 at ¶¶ 24–27), without more, do not necessarily amount to resisting arrest, *see Hill v. City of Fountain Valley*, 70 F.4th 507, 516 (9th Cir. 2023) (noting that the Ninth Circuit has denied qualified immunity where "the refusal [to cooperate] was only verbal[]" (citing *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990)).

Likewise, the discovery of methamphetamine during the search incident to arrest cannot furnish probable cause for the underlying arrest. *See Sibron v. New York*, 392 U.S. 40, 67 (1968) ("[A] search incident to a lawful arrest may not precede the arrest and serve as part of its justification."). Thus, even though Officers found methamphetamine on Plaintiff after arresting him on the PC 148 charge, this makes no difference to his claim here.

In all, the Court finds that the Complaint sufficiently calls into question whether Officers had probable cause to arrest Plaintiff. Because Officers have raised no other basis for dismissing the second cause of action, the Court **DENIES** Individual Defendants' motion to dismiss with respect to the second cause of action.

### B. First Cause of Action: Excessive Force and Retaliatory Force

The first cause of action appears to be an amalgamation of two related claims: first, Plaintiff alleges that Officers used excessive force when arresting him; and, second, Plaintiff alleges that the quantum of force used was in retaliation for his speech. (Doc. 1 at ¶ 49.)

#### 1. Excessive Force

The Fourth Amendment requires police officers making an arrest to use only that amount of force that is objectively reasonable i the circumstances confronting them. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In evaluating a claim of excessive force, the Court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id*. (internal quotation marks omitted). Specifically, the Court "consider[s] 'the type and amount of force inflicted' as well as '(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by

10

flight.'" *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021) (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

Officers contend that the excessive force claim should be dismissed because Plaintiff failed to "address the excessive force portion of his first cause of action which alleges that [Officers] . . . used 'retaliatory, unreasonable, and excessive force.'" (*See* Doc. 37 at 4 (quoting Doc. 1 at ¶ 49).) It is true that, normally, a plaintiff who "makes a claim . . . but [entirely] fails to raise the issue in response to a defendant's motion to dismiss" is deemed to have abandoned that claim. *Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006). Individual Defendants in the instant action, however, have failed to adequately raise and brief the excessive force issue; rather, they merely recited the *Graham* factors without any attempt to apply them to the allegations in the Complaint. (*See generally* Doc. 31 at 13–15; Doc. 37 at 3–5.) As such, the Court declines to dismiss Plaintiff's excessive force based on Plaintiff's failure to respond to Officers' undeveloped, perfunctory argument on excessive force. *See California Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018) ("Inadequately briefed and perfunctory arguments are [] waived." (citation omitted)).

Moreover, viewing the Complaint in the light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently alleged that Officers used "unreasonable and excessive force" to arrest Plaintiff. (Doc. 1 at ¶ 29.)[4] The Complaint alleges that Plaintiff "was thrown down to the ground face first, had his legs crossed and raised up behind him toward his waist, had another officer place a knee in his mid-back toward his neck, and had another officer withdraw his firearm." (*Id.*) The Complaint also claims that "[O]fficers had no reason to believe that Mr. Brown," "a frail 60-year-old," "was violent or armed." (*Id.*) Indeed, Officers have not argued that Plaintiff was engaged in a violent crime, nor that his suspected unlawfulness—"simple possession" of methamphetamine under § 11377(a), resisting a peace officer under § 148(a)(1),

---

[4] The Court rejects Plaintiff's argument that "where there is no reasonable basis to arrest someone[, ]any force used to make an unreasonable arrest is also unreasonable." (Doc. 35 at 6 (citing *Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003); and *Hopkins v. Bonvicino*, 573 F.3d 752, 776 (9th Cir. 2009)). Rather, "the excessive force and false arrest factual inquiries are distinct," such that "establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa." *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004) (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921–22 (9th Cir. 2001)).

trespassing under § 602(o), or unlawful lodging under § 647e—involve acts of violence. *See Rodriguez v. City of Modesto*, No. 1:10-cv-01370-LJO, 2015 WL 1565354, at *17 (E.D. Cal. Apr. 8, 2015) ("The parties agree that the incident in question relates to Rodriguez's arrest for a violation of . . . section 148(a), a nonviolent misdemeanor."). In the absence of evidence to the contrary, the Court must assume at this stage, "that the violation[s were] non-violent in nature." *See Murrietta-Golding v. City of Fresno*, No. 1:18-cv-0314 AWI SKO, 2020 WL 6075757, at *6 (E.D. Cal. Oct. 15, 2020) (citations omitted)). Consequently, the "'severity of the crime at issue' weighs against a finding that the government had an interest in the use of significant force." *See Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1165 (9th Cir. 2011); *see also Booke v. Cnty. of Fresno*, 98 F. Supp. 3d 1103, 1119 (E.D. Cal. 2015) ("Violations of § 148 'will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies.' The non-violent violation of § 148(a)(1) 'will not, without more, give rise to a significant governmental interest in the use of significant force.'" (quoting *Young*, 655 F.3d at 1165)).

Finally, when Plaintiff tried to "explain[] that he had physical limitations[]" which restricted his ability to sit down as instructed, the Officers allegedly kicked his legs, causing him to fall to the ground (Doc. 1 at ¶ 29). It is established that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force," *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012); *see also Westfahl v. D.C.*, 75 F. Supp. 3d 365, 374 (D.D.C. 2014) ("Striking a passive arrestee to compel affirmative compliance is a clearly established constitutional violation." (collecting cases)). This is especially so "[w]hen, as here, a suspect's disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others[.]" *Young*, 655 F.3d at 1165. For these reasons,[5] the Court **DENIES** Individual Defendants' motion to dismiss with respect to the excessive force claim.

///

---

[5] Officers argue that the first cause of action should be dismissed as impermissible shotgun pleading. (Doc. 37 at 4–5.) The Court declines to consider this argument raised for the first time in the reply brief. *See Grange Ins. Ass'n v. Sran*, 184 F. Supp. 3d 799, 819 (E.D. Cal. 2016).

12

2. Retaliatory Force

    *i. The Legal Framework*

In *Nieves v. Bartlett,* 587 U.S. 391, 404 (2019), the Supreme Court explained that retaliatory arrest claims should be evaluated through both subjective and objective lenses. To succeed on a "retaliatory arrest claim," a plaintiff must plead, as a threshold matter, that the officer's decision to arrest him was not objectively reasonable—that is, the officer did not have probable cause—before turning to the usual First Amendment retaliation framework. 587 U.S. at 404. It logically follows that in a First Amendment "retaliatory force" claim,  plaintiff must then allege that "(1) he was engaged in a constitutionally protected activity," (2) that "the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity," and (3) that "the protected activity was a substantial or motivating factor in the defendant's conduct." *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (internal quotation marks omitted)). [6]

    *ii. Application*

Because the Court has found already that the Complaint alleges sufficiently that the Officers used an objectively excessive amount of force to arrest him, it must only consider here whether the complaint demonstrates the First Amendment elements.

The Officers contend that "Plaintiff has not alleged in his Complaint that he was engaged in a constitutionally protected [speech]." (Doc. 31 at 15.) To the contrary, the complaint alleges that Plaintiff was engaged in constitutionally protected speech when he stated his objections to and criticisms of the Officers' actions. (*See* Doc. 1 at ¶¶ 27, 49.) The Officers argue that this speech falls outside the scope of First Amendment protection, but they fail to support this

---

[6] This conclusion is further bolstered by the Eighth Circuit's opinion in *Burbridge v. City of St. Louis, Missouri*, 2 F.4th 774 (8th Cir. 2021). There, the court applied the conventional First Amendment retaliation framework but did not define the defendant's retaliatory, "adverse action" as the use of any force, but specifically the "use of excessive force." *Id*. at 780. Thus, an objective showing of excessive force is indispensably required, regardless of whether it is treated as a standalone inquiry, *cf. Nieves*, 587 U.S. at 404, (considering the absence of probable cause *before* turning to the *Mt. Healthy* test), or as a part of the conventional First Amendment retaliation framework, *see Burbridge*, 2 F.4th at 780 (defining the defendant's retaliatory act as the use of excessive force; and recognizing the defendant's argument that "that if [the plaintiff]'s excessive force claim fails, the First Amendment [retaliation] claim necessarily fails").

13

argument with legal authority, and the Court could not locate any obvious indication that the speech falls within "the few historic and traditional categories [of unprotected expression] long familiar to the bar." *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality) (citation and quotation marks omitted) (alteration modified).

The Officers argue that the Complaint does not clearly show that the Officers' "actions were motivated by their desire to retaliate against [Plaintiff]" for his speech. (*See* Doc. 31 at 15.) Plaintiff points to paragraphs 24, 26, and 27, as well as paragraphs 48 to 51, and argues that those paragraphs show that Plaintiff was "engaged in free speech and that he was pointed out and arrested for that reason." (Doc. 35 at 5–6.)

In these paragraphs, the Complaint alleges that Plaintiff "approached one of the officers, believed to be Officer Diaz, and objected to their actions[]" and "asked . . . what was the basis for the officers' authority." (Doc. 1 at ¶ 24.) He then told the Officers that "he was going to call . . . Dez Martinez of We are Not Invisible (WANI), a grass roots homeless advocacy organization." (*Id*. at ¶ 26.) One of the Officers responded, "'Go ahead and call somebody,' and told another nearby homeless person to whom Mr. Brown spoke, 'Go ahead and listen to this guy [Mr. Brown]. See how that works out.'" (*Id*. (alteration in original).)

In *Hill*, 70 F.4th at 519, the plaintiff argued that "asking the officers 'what was really going on' and saying that he wanted to make sure 'everything's on the up and up' had 'perturbed the officers.'" The Ninth Circuit, however, found it "dubious that the officers would be upset because of benign statements such as 'what was really going on.'" *Id*. (citation omitted). The *Hill* Court considered the concurrence in *Nieves*, in which the Court noted that even though "there [wa]s some evidence of animus in [one of the officers]' statement, 'bet you wish you would have talked to me now,'" it may "not enough to survive summary judgment." 587 U.S. at 421 (Ginsburg, J., concurring in the judgment in part and dissenting in part) (internal citation omitted).

Even still, Plaintiff's allegation of excessive force serves as circumstantial evidence of subjective malice. *Cf. Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 281 (S.D.N.Y. 2019) ("[A] particularly hostile comment that a reasonable person might find objectively unreasonable,

coupled with other evidence, might push the conduct to such a degree to support the element of discriminatory animus[.] . . .”). When Plaintiff tried to “explain[] that he had physical limitations[]” that restricted his ability to sit down as instructed, the Officers allegedly kicked his legs, causing him to fall to the ground. (Doc. 1 at ¶ 29.). Reasonable officers would have understood that kicking Brown was excessive in these circumstances. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) *Westfahl*, 75 F. Supp. 3d at 374 (collecting cases); *see also Nelson*, 685 F.3d at 881 (similar). This conduct when viewed with the fact “that the use of excessive force closely followed [Plaintiff’s] objection and criticism of official action,” (Doc. 1 at ¶ 29), supports an inference that the Officers acted out of subjective animosity towards Plaintiff’s speech.  For these reasons, Plaintiff has sufficiently stated a claim for retaliatory force.

### 3.   Qualified Immunity

“Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was ‘clearly established’” by relevant case law at the time of the challenged conduct. *al-Kidd*, 563 U.S. at 735 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). “[C]learly established law must be ‘particularized’ to the facts of the case[]” and “should not be defined ‘at a high level of generality.’” *White v. Pauly*, 580 U.S. 73, 79 (2017) (first quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); and then quoting *al–Kidd*, 563 U.S. at 742).

Accepting the Complaint’s allegations as true, no reasonable officer could have believed that it was lawful to violently sweeping the legs of a passive, physically limited arrestee to compel affirmative compliance with an order to sit down. *See Westfahl*, 75 F. Supp. 3d at 374 (collecting cases). Likewise, the Officers were also on notice that they may not act out of animus towards a person’s speech. *See, e.g.*, *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990) (“[P]olice officers[,] in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity.”); *Ballentine*, 28 F.4th at 65 (explaining that it has been long “established law in this circuit that there is a First Amendment right to be free from police action motivated by retaliatory animus, even if probable cause existed” (citation and quotation marks omitted)).

Ultimately, a Rule 12(b)(6) dismissal is rarely appropriate where, as here, the Court cannot conclusively "determine, based on the complaint itself, that qualified immunity applies." *See Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001) (footnote citation omitted)). Accordingly, the Court **DENIES** Individual Defendants' motion to dismiss with respect to the retaliatory force claim.

## C. Third Cause of Action: Retaliatory Prosecution

Plaintiff alleges under the third cause of action that the "intentional and reckless actions" of Officers Holden, Diaz, and Quisenberry "resulted in" unconstitutional and retaliatory criminal prosecution against Plaintiff. (Doc. 1 at ¶ 57.) Officers advance two theories upon which they seek to dismiss the third cause of action. Officers first argue that they had probable cause to arrest Plaintiff. (Doc. 31 at 18–19.) The Court, however, has already addressed this argument above and will not repeat it here. Officers argue alternatively that they have statutory immunity under *state* law, (Doc. 31 at 18), which, as Plaintiff correctly points out, cannot immunize Officers from a suit alleging violations of *federal* law, (Doc. 35 at 7). Accordingly, this Court **DENIES** Individual Defendants' motion to dismiss with respect to the third cause of action.

## D. Seventh Cause of Action: Supervisory Liability

Plaintiff alleges under the seventh cause of action that Defendants Chief Balderrama, former Chief Hall, Mayor Dyer, and Lt. Beckwith ("Supervisor Defendants") are individually liable for Plaintiff's injury—that is, having his "personal property destroyed or seized without notice or meaningful recourse[]"—under a theory of supervisory liability. (Doc. 1 at ¶ 75.)

Although a government supervisor may not be held liable for the unconstitutional conduct of his subordinates under a theory of respondeat superior under § 1983, he "can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (quoting *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir. 1998)). "Even under a 'deliberate indifference' theory of individual liability, the Plaintiffs must still allege sufficient facts to plausibly establish the defendant's 'knowledge of' and 'acquiescence

16

in' the unconstitutional conduct of his subordinates." *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012) (quoting *Starr*, 652 F.3d at 1206–07)).

Supervisor Defendants contend that this claim must be dismissed with respect to Chief Balderrama, as he became the police chief 10 months after Plaintiff's injuries had already occurred. (Doc. 31 at 23.). In response, Plaintiff argues that Chief Balderrama did not take actions to rectify FPD's failure to properly train its officers after he assumed the position as the police chief, such that his continued inaction nonetheless makes him liable to the putative class. (Doc. 35 at 10 n.5.)

The Court notes that "when, as here, there are multiple defendants and multiple claims, at least one plaintiff must have standing as to each defendant and each claim." *Rios v. Cnty. of Sacramento*, 562 F. Supp. 3d 999, 1010 (E.D. Cal. 2021) (citation and quotation marks omitted); *see also Martinez v. Newsom*, 46 F.4th 965, 970 (9th Cir. 2022) ("Accordingly, named plaintiffs generally lack standing to sue defendants that have not injured them personally, even if they allege that those defendants injured absent class members." (citing *Easter v. Am. W. Fin.*, 381 F.3d 948, 961–62 (9th Cir. 2004))).[7] In *Perez v. Nidek Co.*, the Ninth Circuit addressed a similar situation where "[the named plaintiffs] sued two groups of doctors: the two doctors who performed surgery on the named plaintiffs, and [unspecified] doctors who performed no surgery on the named plaintiffs, but who allegedly performed surgery on other individuals in the proposed class." 711 F.3d 1109, 1113 (9th Cir. 2013). The named plaintiffs tried "to sidestep the traceability hurdle for the second group of doctors" by nothing "more than conclusory and bare bones words and phrases," which the Ninth Circuit found to be "insufficient to establish standing or *to survive a motion to dismiss*." *Id*. (emphasis added).

Much like the named plaintiffs in *Perez*, Plaintiff states in a footnote that "Chief Balderrama's victims, as the Complaint clearly states, are those similarly situated with Mr. Brown, not Mr. Brown himself." (Doc. 35 at 10 n.5.) But the case law clearly requires Mr.

---

[7] The Court has a duty to sua sponte address potential standing-related issues with respect to Chief Balderrama. *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999) ("[F]ederal courts are required sua sponte to examine jurisdictional issues such as standing." (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986))).

Brown—the only named plaintiff in the instant action—to demonstrate Article III standing. *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) ("[A]t least one named plaintiff must have standing with respect to each claim the class representatives seek to bring." (citation omitted)). Plaintiff's earlier injuries are not "fairly traceable" to Chief Balderrama's purported omissions ten months later. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (citing *Horne v. Flores*, 557 U.S. 433, 445 (2009)); *see also Murthy v. Missouri*, 603 U.S. 43, 59 (2024) ("If the plaintiffs were seeking compensatory relief, the traceability of their past injuries would be the whole ball game.").

With respect to the other Supervisor Defendants, Plaintiff has not alleged sufficient facts "to plausibly establish [that Supervisor Defendants'] 'knowledge of' and 'acquiescence in' the unconstitutional conduct of [their] subordinates[]" arose to the level of "deliberate indifference." *See Hydrick*, 669 F.3d at 942 (quoting *Starr*, 652 F.3d at 1206–07)). For example, Plaintiff alleges, in conclusory terms, that former Chief Hall and Lt. Beckwith "failed to make sure the HTF officers . . . abided by *Kincaid* . . . at all times." (Doc. 1 at ¶ 40.) But occasional failures in supervision do not necessarily evidence a deliberate indifference to constitutional violations, especially if there were good faith efforts to ameliorate the number of violations. *See Johnson v. Martinez*, 131 F. App'x 546, 547–48 (9th Cir. 2005). Plaintiff, however, offers no "specific allegation[]" that former Chief Hall and Lt. Beckwith had knowledge of their subordinates' misconduct. *See Hydrick*, 669 F.3d at 942.

Plaintiff also alleges, in conclusory terms, that "Mayor Dyer has displayed longstanding antipathy toward the rights of the homeless." (Doc. 1 at ¶ 40.) But general "antipathy" towards the general plight of the unhoused is not the same as "antipathy" toward their constitutional rights. Finally, the Complaint suggests that the Supervisor Defendants acted unlawfully by failing to ensure that the "incident pertaining to Mr. Brown became a teaching moment" for police officers, prospectively. (Doc. 1 at ¶ 40.) Even so, it could only impact how police officers conduct themselves going forward.

In sum, Plaintiff has failed to make specific, factual allegations demonstrating that Supervisor Defendants had actual knowledge that police officers under their command were

violating the procedural due process rights of unhoused people or that they tacitly approved of their subordinates' unconstitutional conduct. Accordingly, this Court **GRANTS** Supervisor Defendants' motion to dismiss with respect to the seventh cause of action **with leave to amend**.

### E. Eighth Cause of Action: *Monell* Liability

Plaintiff alleges under the eighth cause of action that the City of Fresno "failed to train, . . . instruct, or supervise" its officers to ensure that they do not "destroy the property of homeless persons during cleanup" of homeless encampments. (Doc. 1 at ¶ 80.)

Within the Ninth Circuit, a local government may be held liable for a person's injury under § 1983 under three possible theories. *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018). First, a local government may be liable if the "execution of [its] policy or custom[] . . . inflict[ed] the injury." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Second, a local government can fail to train its employees in a manner that amounts to "deliberate indifference" to a constitutional right. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc). This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Third, a local government may be held liable when a constitutional tort was committed by an official with final policy-making authority, or when said official "ratified a subordinate's unconstitutional decision or action and the basis for it." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (citations and internal quotation marks omitted). The first two have been raised and discussed in the Complaint and the parties' briefs. (*See, e.g.*, Doc. 1 at ¶ 80; Doc. 16 at 6–8; Doc. 21 at 5–6.)

#### 1. Policy or Custom

To prove a claim for municipal liability under the first theory, a plaintiff must "demonstrate that an 'official policy, custom, or pattern' on the part of [the defendant] was 'the actionable cause of the claimed injury.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022, 1026 (9th Cir. 2008)). A

19

claim may survive the motion-to-dismiss stage if the complaint (1) identifies the challenged policy or custom; (2) explains how the policy or custom was deficient; (3) shows how the policy or custom caused harm to Plaintiff; and (4) explains how the policy or custom amounted to "deliberate indifference" towards Plaintiff's rights. *Lucas v. City of Visalia*, No. 1:09-cv-1015 AWI DLB, 2010 WL 1444667, at *4 (E.D. Cal. Apr. 12, 2010) (Ishii, C.J.) (citations omitted).

An explicit policy "may be found either in an affirmative . . . policy or in the failure of an official 'to take any remedial steps after the violations.'" *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991)). The former is sometimes called a policy of action, which occurs when "the government body itself violates someone's constitutional rights, or instructs its employees to do so[.]" *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). The latter is sometimes called a policy of inaction, which "is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.'" *Id.* (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)).

In addition to proving the existence of a written policy, "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). Liability for a custom, however, may not be predicated on isolated or sporadic incidents; rather, "it must be founded upon practices of [such] duration, frequency and consistency" that "the [challenged] conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citations omitted), *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001).

The City of Fresno argues that Plaintiff has failed to "allege sufficient facts regarding prior instances of conduct by any named, FPD officers," and has "fail[ed] to sufficiently describe" how they "were the moving force of any injury to [P]laintiff." (Doc. 16 at 7–8.) Plaintiff argues that paragraph 39 of the Complaint lays out "very detailed facts" linking "[P]laintiff's mistreatment" to the fact that the City "routinely permit[s] its officers to violate"

20

and flout the core holdings of *Martin* and *Kincaid*. (Doc. 20 at 5–6.) Specifically, Plaintiff alleges that the City has a pattern of providing no advanced notice before cleanup operations. For example, "[o]n the morning of February 21, 2020, a team of officers . . . came without notice and began to inform campers that they had to leave." (Doc. 1 at ¶ 23.) Plaintiff also alleges that the City warned homeless advocate/reporter Mike Rhodes not to disseminate news of the upcoming August 2021 sweep. (*Id.* at ¶ 38(S).) Plaintiff further alleges that "[t]he January 2022 action was done without any advance notice." (*Id.*) However, Plaintiff fails to demonstrate that it is unconstitutional to provide little to no advanced notice prior to "clean up" operations. Rather, Plaintiff must allege that the City has a recent pattern of destroying the people's property without adequate pre-deprivation notice *and* that the property so destroyed neither constitute evidence of a crime nor present an immediate threat to public health or safety. *See Kincaid v. City of Fresno*, No. 1:06–cv–1445 OWW, 2006 WL 3542732, at *42 (E.D. Cal. Dec. 8, 2006). Alleged constitutional violations that took place more than a decade ago, (*see, e.g.*, Doc. 1 at ¶¶ 38(G), 38(I)), do not display a current pattern of constitutional violation.

Plaintiff also claims to have recited, "in extreme detail[,] the City of Fresno's lamentable history of marginalizing, and harassing, and denying the rights of the homeless" in paragraphs 38 and 39 of the Complaint. (Doc. 21 at 5.) For instance, Plaintiff alleges in paragraph 38 of the Complaint that the City has "woefully inadequate" temporary shelter space, (Doc. 1. at ¶ 38(V)); that the City "has prioritized temporary shelter space over sustainable long term living arrangements," (*id.*); that the City failed to properly "utilize available funding and hire staff," (*id.* at ¶ 38(O)); and that the City "enacted an ordinance that has the effect of penalizing property owners who allow the homeless to camp on unused private lots," (*id.* at ¶ 38(K)). Apart from a possible connection to a now-impermissible claim based upon *Martin*, however, it is not clear how these allegations directly connect to a constitutional violation.

In short, Plaintiff has not provided sufficiently detailed factual allegations showing that the City and its officers have a recent pattern of destroying people's property during cleanup operations without the requisite pre- or post-deprivation hearing. Plaintiff has failed to allege where, when, and how "HTF officers . . . seize[d] and destroy[d]" homeless people's property

without "complying with the notice and claim procedures established by *Kincaid*." (*See* Doc. 1 at ¶ 38(L).)

### 2. Failure to Train

Under limited circumstances, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To establish liability under this theory, the "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id*. (quoting *Harris*, 489 U.S. at 388) (alteration in original). This "stringent standard of fault" requires proof that "policymakers [we]re on actual or constructive notice [about] a *particular omission* in their training program," *Connick*, 563 U.S. at 61 (emphasis added), as well as proof that the identified deficiency was "closely related to"—and was the ultimate cause of—Plaintiff's injury, *Harris*, 489 U.S. at 391.

In support of his failure-to-train theory, Plaintiff argues that the City "fail[ed] to train and educate its officers regarding the law, specifically, *Kincaid v. City of Fresno*, *Martin v. City of Boise*, and related precedent[s.]" (Doc. 21 at 6; *see also* Doc. 1 at ¶ 39 ("The individual defendant officers were not trained or encouraged to abide by the holdings of *Kincaid* or *Martin*.").) Even though paragraph 38(L) alleges that Officers Holden, Diaz, and Quisenberry testified in state court that HTF officers were not trained on cases related to *Martin* and its progeny, (Doc. 1 at ¶ 38(L); *see also* Doc. 16 at 8; Doc. 21 at 6), *Martin* is no longer good law, and Plaintiff has not explained how the City's training and hiring practices were deficient in light of this Court's opinion in *Kincaid*.[8] Because Plaintiff has failed to do so, the Court **GRANTS** the City's motion to dismiss the eighth cause of action **with leave to amend**. *See AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (explaining that leave to amend is appropriate when plausible facts supporting a policy or custom may cure deficiencies associated with a *Monell*

---

[8] Defendants argue that "*Kincaid* has no application" in the present case because it "was concluded by way of settlement, and all plaintiffs were barred from future prosecution of claims." (Doc. 23 at 3.) However, there is no evidence or allegation that Plaintiff was a member of the class action that this Court had certified in *Kincaid*. Nor did this Court's opinion in *Kincaid* lose its persuasiveness merely because the case ultimately ended with a settlement.

claim).

### 3. Fourteenth and Fifteenth Causes of Action

The fourteenth and fifteenth causes of action do not appear to be standalone substantive claims; rather, they merely request injunctive relief contingent on the outcome of the eighth cause of action. (*See* Doc. 1 at ¶ 111–20.) And because the Court has already granted the City's motion to dismiss the eighth cause of action with leave to amend, the same disposition is warranted here. Accordingly, the Court **GRANTS** the City's motion to dismiss the fourteenth and fifteenth causes of action **with leave to amend**, provided that any amendments are consistent with the reasoning above.

## V.    REMAINING STATE LAW CLAIMS

### A. Ninth Cause of Action: Unlawful and Retaliatory Arrest Under the Banes Act

Plaintiff's ninth cause of action alleges that Officers Holden, Diaz, and Quisenberry violated Plaintiff's right to be free from retaliatory and false arrests. (Doc. 1 at ¶ 83.) A plaintiff may bring a cause of action under California Civil Code § 52.1 ("Bane Act") when "[a] person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]." Cal. Civ. Code § 52.1(b). To sufficiently plead a violation of the Bane Act, "a plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (Cal. Ct. App. 2015) (citations omitted).

Officers argue that California Government Code § 821.6 bars liability from Plaintiff's ninth cause of action. (Doc. 31 at 27.) Section 821.6 insulates public employees from liability "for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Notably, however, California Government Code § 820.4 provides, "A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. **Nothing in this**

23

**section exonerates a public employee from liability for false arrest or false imprisonment**.” (Emphasis added; *Asgari v. City of Los Angeles*, 15 Cal.4th 744, 757 (1997), as modified on denial of reh'g (Mar. 17, 1997) [“Under California law, a police officer may be held liable for false arrest and false imprisonment, but not for malicious prosecution.”] As such, the Court rejects Officers’ claim of § 821.6 immunity to the extent that the Ninth Cause of Action does not raise a malicious prosecution claim.

Officers Holden, Diaz, and Quisenberry also argue that they did not interfere with Plaintiff’s constitutional rights because they had probable cause to arrest Plaintiff. (Doc. 31. at 25.) The Court rejects this argument because, as discussed above, Plaintiff has sufficiently alleged there was an absence of probable cause. Officers further contend that Plaintiff did not show that they had “interfered with Plaintiff’s legal rights by the use of threats, intimidation, or coercion.” (Doc. 31. at 25.) In response, Plaintiff correctly points out, (Doc. 35 at 11), that an unlawful arrest—e.g., without probable cause—made with excessive force is a violation of the Bane’s Act, *Bender v. Cnty. of Los Angeles*, 217 Cal. App. 4th 968, 978 (Cal. Ct. App. 2013) (“Where, as here, an arrest is unlawful *and* excessive force is applied in making the arrest, there has been . . . a violation of the Bane Act.” (emphasis in original)). Thus, the Court **DENIES** Individual Defendants’ motion to dismiss with respect to the ninth cause of action.

**B.  Tenth and Twelfth Causes of Action: Malicious and Retaliatory Prosecution**

Under the tenth and twelfth causes of action, Plaintiff alleges that the Officers “authored reports that were false and misleading”—and, as a result, “Mr. Brown was criminally charged by the Fresno District Attorney.” (Doc. 1 at ¶¶ 88, 100.) The initiation of the criminal prosecution against Plaintiff therefore allegedly violated his right to be free from retaliatory and malicious prosecutions.

Officers once again argue, among other things, that California Government Code § 821.6 bars liability from Plaintiff’s state law retaliatory prosecution claim. (Doc. 31 at 27.) As Plaintiff recognizes elsewhere in his brief in opposition, “under California law, a police officer is granted statutory immunity from liability for *malicious prosecution* [§ 821.6], but not for false arrest and imprisonment.” (*See* Doc. 35 at 11 (citation omitted) (alteration in original) (emphasis added).)

24

This admission by Plaintiff renders his tenth and twelfth causes of action untenable, nor has he tried to defend them. Accordingly, the Court **GRANTS** Individual Defendants' motion to **DISMISS** the tenth and twelfth causes of action **WITH PREJUDICE**.

### C. Eleventh Cause of Action: False Arrest Under State Common Law

Plaintiff alleges under the eleventh cause of action that the actions of Officers Holden, Diaz, and Quisenberry violated Plaintiff's right under state law to be free from false arrests, as the facts "demonstrate that there was no probable cause to arrest Mr. Brown and that his arrest closely followed his objection to and criticism of official action." (Doc. 1 at ¶ 95.)

Officers claim that they enjoy statutory immunity under California Penal Code § 847(b) from Plaintiff's common law false arrest/false imprisonment claim because they "had probable cause to arrest Plaintiff. . ." (*See* Doc. 31 at 28–29.) That statute provides that an officer cannot be held civilly liable for false imprisonment where the officer, "acting within the scope of his or her authority," made a "lawful" arrest or "had reasonable cause to believe the arrest was lawful." Cal. Pen. Code § 847(b). Again, as noted above, there is no immunity for false arrest—meaning arrest without probable cause—as noted by California Government Code § 820.4. Because the Court has already found above that Plaintiff has sufficiently alleged the absence of probable cause, the Court **DENIES** Individual Defendants' motion to dismiss with respect to the eleventh cause of action.

### D. Thirteenth Cause of Action: Negligence Under State Common Law

It is not immediately apparent to the Court what Plaintiff is alleging under the thirteenth cause of action—paragraphs 107 to 110 merely states, among other things, that "the officers" involved "had a duty [] . . . not to cause harm to [Plaintiff]," as well as an obligation "to engage in the non-negligent performance of their duties." (Doc. 1 at ¶ 108.) Individual Defendants argue that Plaintiff's thirteenth cause of action must be dismissed on two distinct grounds.

Individual Defendants argue that § 821.6 immunity insulates police officers from this negligence claim. (Doc. 31 at 31–32.) This argument has already been rejected by the Court in Part V.A above. Individual Defendants also argue that this claim "should be dismissed with prejudice for lack of reference to statutory basis to impose liability on [Individual D]efendants in

his Complaint." (Doc. 31 at 31–32.) In response, Plaintiff invokes California Government Code § 820(a) for the proposition that public employees may be held liable to the same extent as private persons under general tort principles, absent statutory immunities to the contrary. (Doc. 35 at 12.)

On the one hand, the California Tort Claims Act "provides that a *public employee* generally is liable for an injury caused by his or her act or omission 'to the same extent as a private person' [under § 820(a)] and that, when the act or omission of the public employee occurs in the scope of employment the public entity will be vicariously liable for the injury [under § 815.2.]" *Zelig v. Cnty. of Los Angeles*, 27 Cal. 4th 1112, 1127 (Cal. 2002) (emphasis added). On the other hand, "direct tort liability of *public entities* must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on the general tort provisions of [California] Civil Code section 1714." *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175, 1183 (Cal. 2003) (emphasis added). Therefore, contrary to Individual Defendants' position, Plaintiff need not state a statutory basis to bring a tort claim against a government *employee*. Accordingly, the Court **DENIES** Individual Defendants' motion to dismiss the thirteenth cause of action.

## VI.   MOTION TO STRIKE

### A.  Derogatory or Immaterial

The City moves the Court to strike and begins with the City's request to strike paragraphs 24, 38(D), 38(G), and 38(K) of the Complaint. Rule 12(f) of the Federal Rules of Civil Procedure grants district courts the authority to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Words like "immaterial" refer to matters that have "no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (internal quotation and citation omitted), *rev'd on other grounds*, 510 U.S. 517 (1994). "Scandalous allegations are 'allegations that cast a cruelly derogatory light on a party or other person.'" *Downey Firemen's Ass'n v. City of Downey*, No. SACV 14-01213-CJC(RNBx), 2015 WL 12781202, at *1 (C.D. Cal. Mar. 19, 2015) (quoting *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000))). They include "any allegation that unnecessarily reflects on the moral character of an

individual or states anything in repulsive language that detracts from the dignity of the court." *Weng v. Solis*, 842 F. Supp. 2d 147, 161 (D.D.C. 2012). Allegations that are essential to Plaintiffs' claims, however, should not be struck; in fact, "courts regularly decline to strike from the record 'unpleasant' facts that are relevant to a cause of action or defense." *Sirois v. E. W. Partners, Inc.*, 285 F. Supp. 3d 1152, 1162 (D. Haw. 2018).

Motions to strike are not granted unless the matter to be stricken clearly has "no possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (citations omitted). Indeed, when ruling on a Rule 12(f) motion to strike, the Court views the pleading in the light most favorable to the plaintiff, and if there is genuine "doubt as to whether the challenged matter may raise an issue of fact or law, the motion to strike [would] be denied, leaving an assessment of the sufficiency of the allegations for adjudication on the merits." *Carolina Cas. Ins. Co. v. Oahu Air Conditioning Serv., Inc.*, 994 F. Supp. 2d 1082, 1090-91 (E.D. Cal. 2014); *see also RDF Media Ltd. v. Fox Borad. Co.*, 372 F.Supp.2d 556, 561 (C.D. Cal. 2005).

The City contends that that terms like "cop-splained" and "poverty pimping" should be struck from the Complaint because they are "derogatory, immaterial and not pertinent to anything in this matter." (Doc. 23 at 7; Doc. 16 at 9.) Plaintiff, on the other hand, argues that "colorful, yet relatively common" and "nonprofane language used to describe a practice" should not be stricken. (Doc. 21 at 12.) The Court agrees with Plaintiff that Defendant have yet to advance non-conclusory arguments or cite any "pertinent authority for [its] argument" that those two phrases should be struck from the complaint. (*See id*. at 11–12.)

Next, the City argues that paragraphs 38(G) and 38(K) of the Complaint should be stricken because they "are attenuated, immaterial, and not germane to the issues of the complaint." (Doc. 16 at 9 (citation to the record omitted).) First, with respect to the "reference to 36 lawsuits being settled in 2014" in paragraph 38(G), (*id*. at 9), the Court finds it to be potentially relevant, for it could be used as circumstantial evidence to show the City's knowledge or pattern of behavior. *See Martel v. Cadjew*, No. CIV S-11-0509 JAM EFB PS, 2011 WL 4386209, at *2–4 (E.D. Cal. Sept. 20, 2011) (denying a motion to strike "superfluous historical

27

allegations" because they "provide [] context for plaintiff's lawsuit and reflect on defendants' knowledge and awareness"); *LeDuc v. Ky. Cent. Life Ins. Co.*, 814 F.Supp. 820, 830 (N.D. Cal. 1992) ("[A]llegations supplying background or historical material . . . will not be stricken unless unduly prejudicial to defendant."). Second, Plaintiff argues that the reference to "pressuring private property owners to evict the homeless" in paragraph 38(K), (Doc. 16 at 9), could be "indicative of the City's . . . intent." (Doc. 21 at 13). However, the Court struggles to see the relevance of this allegation considering that *Martin* is no longer good law. *See Mireskandari v. Daily Mail & Gen. Tr. PLC*, No. CV 12-02943 MMM (FFMx), 2013 WL 12129642, at *5 (C.D. Cal. July 31, 2013) (suggesting that certain allegations may become irrelevant—and therefore "immaterial" for purposes of Rule 12(f)—after some of the claims are stricken from the complaint). Accordingly, the Court **GRANTS** the City's motion to strike with respect to paragraph 38(K) of the Complaint **with leave to amend**.

### B. Class Allegations

"It is well established that Rule 23(a) of the Federal Rules of Civil Procedure . . . places the burden on the party seeking class certification to establish numerosity, commonality, typicality, and adequacy of representation. Where the complaint demonstrates that a class action cannot be maintained on the facts alleged, a defendant may move to strike class allegations prior to discovery. Before a motion to strike is granted, the court must be convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed." *Tobajian v. Allstate Corp.*, No. CV 23-753-DMG (PDX), 2023 WL 12051746, at *2 (C.D. Cal. Aug. 31, 2023) (internal citations and quotation marks omitted) (alteration in original). Indeed, "[i]t is rare for the Court to strike class allegations at [an early] stage in the litigation." *Dake v. Receivables Performance Mgmt., LLC*, No. EDCV 12-01680 VAP (SPx), 2013 WL 11332863, at *5 (C.D. Cal. Apr. 16, 2013) ("Class allegations are generally not tested at the pleading stage, and instead are tested at the class certification stage." (citing *Thorpe v. Abbott Labs., Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008))). Courts often decline to strike class allegations, preferring to delay such ruling until the class certification stage. *Id.*

The City Defendant begins by arguing that, because Plaintiff's proposed class definition is

"so ambiguous and overbroad, it is impossible to provide evidence concerning issues of numerosity, technicality, and other requirements" of Rule 23. (Doc. 16 at 9.) The City further argues that the current class definition requires "an individualized inquiry into each and every class member's situation to determine if commonality and typicality exist[.]" (Doc. 23 at 5-6 (citation omitted).) As such, the City urges this Court to strike all class allegations in paragraphs 43 to 45 of the Complaint. (Doc. 23 at 7.)

Plaintiff argues that his proposed class definition is very similar to what was approved by this Court in *Kincaid v. City of Fresno*, 244 F.R.D. 597 (E.D. Cal. 2007). There, this Court certified a class that is comprised of "[a]ll persons in the City of Fresno . . . whose personal belongings have been unlawfully taken and destroyed a sweep, raid, or clean up by any of the Defendants." *Id*. at 601.

In *Dake*, where the defendant argued repeatedly, "that individual evidence is required to prove each plaintiff's claim and individual fact questions predominate over commons issues of law and fact." 2013 WL 11332863, at *5 (footnote and citation to the record omitted). The court found that the plaintiffs have made sufficient allegations to survive a motion to strike. *Id*. The court further explained that the defendant's request to strike was "premature" and that "[the defendant]'s Motion to Strike [wa]s a thinly veiled opposition to a yet-to-be-filed motion for class certification." *Id*.

As in *Dake*, the City Defendant offer no factual support for its conclusory argument that individualized determinations would predominate over common questions of law and fact. *See id*. Subsequent proceedings may help to refine the class allegations and aid the Court in determining whether class certification is appropriate. *Id*.

To be sure, the Court recognizes the City's argument that the proposed class definition here is far broader than the one approved in *Kincaid*—not only does it reach into past events, but also future events. (*See* Doc. 23 at 5 (noting that the class definition encompasses all people who "will have laws or initiatives enforced against them" in the future).) The Court also recognizes, as the City correctly points out, that *Kincaid* was focused on an administrative ordinance, such that there is a clear common issue, (*id*.), whereas the instant action is focused on an unwritten policy

or custom, potentially requiring far more individualized determinations than in *Kincaid*.

However, the City overlooks the fact that the proposed class definition in the Complaint is subject to revision as the case proceeds towards class certification. As such, the Court agrees with Plaintiff that the City's challenges to the class allegations are premature—they may be properly addressed at the class certification stage. (*See* Doc. 21 at 8, 11 (arguing that the case should proceed to the class certification stage and pointing out that the only case cited by the City was an appeal from a class certification ruling).) For these reasons, the Court **DENIES** the City's motion to strike paragraphs 43 to 45 of the Complaint **without prejudice**.

## VII.   CONCLUSION

Based upon the foregoing, the Court **ORDERS**:

(1) The City's Motion to Dismiss (Doc. 16) the eighth cause of action is **GRANTED with 21 days leave to amend,** provided that any amendments do not rely on a legal theory foreclosed by *Grants Pass*.

(2) The City's Motion to Strike (Doc. 16) is **GRANTED IN PART** with respect to paragraph 38(K) of the Complaint **with 21 days leave to amend.**

(3) Individual Defendants' Motion to Dismiss (Doc. 31) is **GRANTED IN PART**
   a. Plaintiff's fifth, tenth, and twelfth causes of action are **DISMISSED with PREJUDICE**.
   b. Plaintiff's seventh, fourteenth, and fifteenth causes of action are **DISMISSED with 21 days leave to amend**, provided that any amendments do not rely on a legal theory foreclosed by *Grants Pass*.

(4) Individual Defendants' Motion to Dismiss (Doc. 31) is **DENIED IN PART** as to Plaintiff's excessive and retaliatory force claims under the first cause of action.

(5) Individual Defendants' Motion to Dismiss (Doc. 31) is **DENIED IN PART** with respect to the second, third, ninth, eleventh, and thirteenth causes of action.

IT IS SO ORDERED.

Dated:   **March 13, 2026**

UNITED STATES DISTRICT JUDGE

30